**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

INNOVATIT SEAFOOD SYSTEMS, LLC,    )
            )
        Plaintiff,      )
            )
    v.           )      Civil Action No. 06-0825(JR)
            )
COMMISSIONER FOR PATENTS,    )
            )
        Defendant.    )

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................i

I.      PARTIES ..........................................................................................................1

II.     ISSUES ............................................................................................................1

III.    INTRODUCTION ............................................................................................2

IV.   APPLICABLE LAW .......................................................................................6

      A.     Anticipation Under 35 U.S.C. § 102 ....................................................7

      B.     .........................................................................Product-by-Process Claims    7

      C.     Structural Differences Between the Products  Should be Taken Into
            Consideration ......................................................................................10

V.     STATEMENT OF MATERIAL FACTS .......................................................11

VI.   ARGUMENT ..................................................................................................13

      1.     The Finding of Novelty of the Instant Claims Depends on the Correct Reading of
            Scripps, Atlantic Thermoplastics and SmithKline ..................................14

2.      Plaintiff Met the Burden of Establishing Unanticipated Structural Differences Between Plaintiff's Product and Prior Art Product ................................................14

3.      The Inventor of the '064 Patent Acknowledged That Heat Treatment Structurally Alters the Product in a Later-Issued Patent .........................................................19

        1.      Tesvich et al's '064 patent does not disclose a practical method of elimination of *Vibrio Vulnificus;* ..........................................................21

        2.      Product produced according to at least some of the criteria of the '064 patent produces a cooked product; ......................................................20

        3.      Undue experimentation is required to follow the '064 patent to achieve the claimed result; ........................................................................20

        4.      Product produced by the heat method of the '064 patent and the claimed product are different in taste, texture and appearance; ........................................20

        5.      Product of the '064 patented process does not produce a shucked oyster; 21

        6.      Product of the instant invention is structurally different from the product of the '064 patent. ................................................................21

VII.    CONCLUSION ........................................................................21

STATEMENT OF UNCONTESTED FACTS IN SUPPORT OF INNOVATIT SEAFOOD SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO LOCAL RULE LCvR7(h) ................................................................................1

# TABLE OF AUTHORITIES

*PAGE(S)*

**CASES**

Application of Bridgeford, 53 C.C.P.A. 1182, 357 F.2d 679, 149 U.S.P.Q. (BNA) 55 (1966) ..... 8

Atlantic Thermoplastics Co., Inc. v. Faytex Corp., 970 F.2d 834, 23 U.S.P.Q.2d (BNA) 1481
  (Fed. Cir. 1992) ........................................................................................ 8, 9, 14, 15

Brown, 459 F.2d 531,173 U.S.P.Q. 685 (CCPA 1972) ............................................. 15

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ............................................................ 6

Cochrane v. Badische Anilin & Soda Fabrik, 111 U.S. 293, 4 S. Ct. 455, 28 L.
Ed. 433 (1884) ............................................................................................... 8

Columbia Univ. v. Roche Diagnostics GmbH, 126 F. Supp.2d 16 (D.Mass.2000) ..................... 9

DeKalb Genetics Corp. v. Northrup King Co., No. 96 C 50169, 1997 WL 587492,
*2 (N.D.Ill. Aug.14, 1997)................................................................................. 9

Elan Pharmaceuticals, Inc. v. Mayo Foundation for Medical Education and Research,
304 F.3d 1221 (Fed. Cir. 2002).......................................................................... 7

Garnero, 412 F.2d 276, 162 U.S.P.Q. 221 (CCPA 1979) ........................................... 11

Gartside, 203 F.3d 1305 (Fed. Cir. 2000) .............................................................. 7

General Electric Co. v. Nintendo Co., 179 F.3d 1350 (Fed. Cir. 1999) ....................... 10

Helifix Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339 (Fed. Cir. 2000)........................... 10, 14

Hirao, 535 F.2d 67 (CCPA) .............................................................................. 15

Luck, 476 F.2d 650 (CCPA 1973) ...................................................................... 10

Mazzari v. Rogan, 323 F.3d 1000 (Fed. Cir. 2003) ................................................. 7

Merrill v. Yeomans, 94 U.S. 568, 24 L. Ed. 235 (1876) ........................................... 8

Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005) ( en banc ) ........................... 9

Rhoads v. McFerran, 517 F.2d 66 (2d Cir. 1975) .................................................... 6

Scripps Clinic & Research Foundation v. Genentech, Inc.,

927 F.2d 1565 (Fed. Cir. 1991)........................................................................... 7, 8, 9, 15

SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312 (Fed. Cir. 2006), ................... 10, 15

Tropix, Inc. v. Lumigen, Inc., 825 F. Supp. 7 (D.Mass. 1993)            9

Waterhouse v. District of Columbia, 298 F.3d 989 (D.C. Cir. 2002) ........................................... 6

Wertheim, 541 F.2d 257 (CCPA 1976) ..................................................................... 15

## OTHER AUTHORITIES

Administrative Procedure Act ................................................................................................. 7

Chisum on Patents § 8.05[1][b] ............................................................................................... 9

Conflicts in Federal Circuit Patent Law Decisions, 11 Fed. Cir. B.J. 723 (2002)
(describing controversy) ........................................................................................................ 9

E. P. Mirabel, Product-by-Process Claims: A Practical Perspective,
68 J. Pat. & Trademark Off. Soc'y 3 (1986) ........................................................................ 9, 10

D.J. DeBenedictis, "Inconsistent Patent Rulings," 78 A.B.A.J. 36 (Dec. 1992) ........................... 8

## RULES

35 U.S.C. § 102(b) ............................................................................................................... 7

35 U.S.C. §102(e) ............................................................................................... 1, 11, 14

35 U.S.C. § 706 (2000) ........................................................................................................ 7

37 CFR 1.132 ................................................................................................................... 18

Rule 56 of the Federal Rules of Civil Procedure ..................................................................... 1, 6

## REGULATIONS

MPEP Sec. 2113 ............................................................................................................... 10, 15

## I.     PARTIES

Plaintiff Innovatit Seafood Systems, Inc. ("Innovatit" or "Plaintiff") and the current assignee of the application-in-suit Avure Technologies, Inc. ("Avure"), by their undersigned counsel, respectfully move for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, Local Rules LCvR-56.1 and the Court Minute Order of August 28, 2007, seeking an Order that Claims 5 and 27-38 of the application-in-suit – U.S. Patent Application No. 09/949,704 (Exhibit 1) are not anticipated under 35 U.S.C. §102(e).

Avure is the real party in interest in this action.

## II.     ISSUES

The issues presented here are:

(1) whether the asserted Claims 5 and 27 - 38 of the application-in-suit are anticipated under § 102(b), by U.S. Patent No. 5,773,064 (Tesvich or "the '064 patent")?

(2) whether the BPAI properly applied the law of anticipation in rejecting the asserted claims of the application-in-suit?

(3) whether the BPAI's actions/findings of fact are arbitrary, capricious, an abuse of discretion and unsupported by substantial evidence?

Plaintiff submits that there are no genuine issues of fact that would prevent this Court from granting Plaintiff's motion as a matter of law over any countervailing arguments that the Director of the U.S. Patent Office ("PTO" or "Defendant") may assert. The Defendant simply cannot satisfy its burden of producing prima facie proof that the claims of the application-in-suit are anticipated under any of the theories advanced by the PTO. As discussed in detail below, the actions and findings of fact made by the BPAI are arbitrary, capricious, contrary to substantial evidence and constitute a clear abuse of discretion.

As outlined below, the undisputed facts and evidence of record establish that the '064 patent does not disclose, either expressly or inherently, and within the four corners of the documents, every limitation of the asserted claims of the application-in-suit as necessary to render the claims anticipated.

### III.    INTRODUCTION

Plaintiff was and Avure is, the current assignee of the entire right, title and interest in and to the invention of Ernest A. Voisin relating to a post-pressurized raw shellfish that is pressure-shucked and free from pathogenic naturally-occurring marine bacteria. Because the technology involved in this lawsuit is of an immense value not only to food safety and public health but also to the interstate commerce, the following brief background is provided.

In recent years, considerable attention has been paid in the media to tragic results of consumption of raw oysters where the individuals became infected with life threatening pathogenic organisms. Such bacteria as *Vibrio vulnificus* and *Vibrio parahaemolyticus* live in a marine environment, especially in warm waters, usually higher than 25$^{\circ}$ C. Other organisms of concern are *Vibriones: Vibrio cholerae O1, Vibrio cholerae non-O1, Vibrio mimicus, Vibrio Fluvalis, Vibrio furnissii, Vibrio hollisae, Vibrio alginolyticus, Listeria monocytogenes, Salmonella (nontyphoidal)* and *Salmonella typhi, Campylobacter jejuni, Escherichia coli, Yersinia enterocolitica, Clostridium botilinum, Clostridium perfringens, Shigella, Staphylococcus aureus*.

Some other organisms that can cause disease in normal, healthy adults and which were either isolated from seafood or proven pathogen in seafood are: *Helminths* (*Anisaxis simplex* and other *helminths*); Viruses: *poliovirus*, other *picomaviruses*, Norwalk/Snow Mountain/small round viruses, or SRVs; Hepatitis A and E and non-B Hepatitis, and *bacillus cereus*. Additionally, there

is a series of organisms that can cause disease most often in special population groups; these are *rotavirus* and *Listeria*. Some of the above organisms occur naturally in water; some are the result of water pollution, and some are associated with processing and preparation of food, for example cross-contamination or time/temperature abuse, as well as infected food handlers.

*Vibrio Vulnificus* has been isolated from estuarine and marine waters of the U.S. Gulf Coast, East Coast, and West Coast; it was also reported on other continents. The bacteria may transfer from water to the shellfish inhabiting the body of water, especially filter-feeding mollusks, where bacteria can multiply mostly in the gut region. *Vibrio* is a genus of motile curved and rod-shaped Gram-negative bacteria. Other well-known vibriones are *Vibrio cholerae* and *Vibrio Parahaemolyticus*. *Vibrio cholerae* presents a threat to public health and can even cause an epidemic, if not checked in time. *Vibrio Parahaemolyticus* is a common cause of gastroenteritis in some cultures, where consumption of food is particularly high, such as for example Japan.

*Vibrio Vulnificus* is a halophilic species, the strains of which are similar to *Vibrio Parahaemolyticus* and *Vibrio alginolyticus*. *Vibrio Vulnificus* thrives in warm waters. Ingesting uncooked or undercooked shellfish that contain vibrios, especially raw oysters, transmits it. After a brief incubation period, often as short as two hours, *Vibrio Vulnificus* causes septicemia and cellulitis. Physical symptoms include indigestion, cramps, nausea, vomiting, headache, weakness, fever and chills. While fatal outcomes are extremely rare, the unfortunate events have been widely publicized, making the public aware of a potential life threatening exposure to the *Vibriones* and other pathogens. The fear of the bacteria poisoning is so high that the federal government issued a special warning advising the public of the potential dangers of raw oyster consumption. It has also been suggested that no harvesting of oysters be conducted during warm

months in the Gulf of Mexico, so as to minimize the health risk associated with such food poisoning. Public fear of the potential dangers associated with bacteria poisoning through raw oyster consumption adversely affected an important Louisiana industry - oyster harvesting. Market share of Gulf oysters shrunk, and many fishermen found that even oysters harvested from safe beds are not in such a great demand as they used to be and that the price has fallen drastically.

Still, consumption of raw molluscan shellfish and other crustaceans is so widespread in the South that many restaurants continue to carry raw oysters as part of their menu. Even though many restaurants post a warning sign of the possible danger to a segment of the public with liver or immune system disorders it rarely stops dedicated gourmands.

To prevent poisonous consumption of pathogenic organisms, various methods have been suggested for treating raw shellfish, for example with heat or irradiation, in an effort to eliminate or minimize the public health danger. However, heating of the shellfish affects the sensory qualities of the product, making it less desirable for consumption as raw shellfish. Heat treatment as a means of controlling microorganisms and bacteria in food products results in diminished taste and reduced nutritional content. Therefore, elevated temperatures are considered unsatisfactory for processing of raw oysters where the purpose of the process is to retain sensory qualities of oysters and sell them on a half-shell. Ionizing irradiation is relatively expensive and has not yet obtained approval by the Federal Food and Drug Administration. Other known attempts to purify raw oysters involve depuration, wherein oysters are soaked in a tank of water for days at a time in an attempt to purge and cleanse the mollusk of the bacteria. So far, there have been no reports on the success of this method in destruction of bacteria in raw oysters.

Other suggested methods of destroying *Vibrio Vulnificus* involve cold, freezing, vacuum packaging, use of GRAS (diacetyl) compounds, suspension relaying into offshore water, and food condiment treatment. While some of these methods are relatively simple to implement, most of them have problems - too expensive, ineffective, time consuming, or failed to receive FDA approval.

An additional factor that should be taken into consideration when selling raw seafood is sensory qualities of the product, its texture, taste and appearance. Among connoisseurs, it is recognized that a good raw oyster has a mild salty taste. An ideal oyster has about 12 parts per thousand of salt in the juice. However, in some cases, due to various environmental factors, oysters are not salty, which makes them less desirable from the standpoint of marketing a perfect product. High-pressure treatment is believed to provide a solution to the problem of retaining sensory qualities of seafood. The method disclosed in the application-in-suit offers a safe method of eliminating naturally-occurring pathogenic bacteria from shellfish, while retaining sensory characteristics of the shellfish such that the processed shellfish has the raw shellfish appearance, texture and taste.

The discovery by the inventor, Mr. Voisin, of a safe method of eliminating the pathogens was met with universal acclaim and widespread utilization in the seafood processing industry, including licensing of the technology to many commercial enterprises. The Plaintiff submitted ample evidence of the differences between the product produced by the claimed method and the product as produced by the cited reference. The Defendant appears to be totally unimpressed by this evidence and continues to impose unsupported and unsupportable arguments in its rejection of the claims of the application by selective text manipulation and inference. The Patent Office simply manipulates selectively extracted texts, ignores the actual, field-tested evidence and

imposes the standard on this applicant, which defy common sense and are contrary to the law. Moreover, the BPAI, in its ultimate wisdom, chose to add an additional, not cited during the examination, reference, just in case this Court overrules the Defendant on the main issue, thereby further protracting the process of obtaining patent protection by this inventor.

Inventor Ernest A. Voisin presented evidence that he was the first to achieve the success in producing a post-pressurized bacteria-free molluscan shellfish product that retains the sensory characteristics of raw seafood, while not suffering from heat-induced or mechanical damage. There was no such product in existence prior to Mr. Voisin's invention; there is no such product now outside of the field, where Mr. Voisin's invention is licensed. For this reason and further in view of the detailed discussion presented below, the PTO rejection of the asserted claims should be found arbitrary, capricious, not supported by substantial evidence and a clear abuse of discretion.

## IV.    APPLICABLE LAW

This case is before the Court on the parties' cross motions for summary judgment. Pursuant to Federal Rule of Civil Procedure 56, summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. See Federal Rules Civil Procedure 56; Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Waterhouse v. District of Columbia, 298 F.3d 989, 991 (D.C. Cir. 2002). Likewise, in ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. See Rhoads v. McFerran, 517 F.2d 66, 67 (2d Cir. 1975).

The "PTO is an agency subject to the Administrative Procedure Act" ("APA"), and therefore "a reviewing court must apply the APA's court/agency review standards." Mazzari v. Rogan, 323 F.3d 1000, 1004 (Fed. Cir. 2003). Accordingly, the Court should set aside legal actions of the Board that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and set aside factual findings that are "unsupported by substantial evidence." 35 U.S.C. § 706 (2000); Mazzari, 323 F.3d at 1005; In re Gartside, 203 F.3d 1305, 1316 (Fed. Cir. 2000)

## A.  Anticipation Under 35 U.S.C. § 102

To establish that a publication anticipates a claim under 35 U.S.C. § 102(b), the PTO must show that all features of the asserted claims are found in a single prior art reference.  See Elan Pharmaceuticals, Inc. v. Mayo Foundation for Medical Education and Research, 304 F.3d 1221, 1227 (Fed. Cir. 2002) (stating that anticipation "requires that all of the elements and limitations of the claimed subject matter must be expressly or inherently described in a single prior art reference"). "There must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention." Scripps Clinic & Research Foundation v. Genentech, Inc., 927 F.2d 1565, 1576 (Fed. Cir. 1991).

Here, the PTO was required to demonstrate that ALL features of every claim of the application-in-suit are present in a single reference.

## B.  Product-by-Process Claims

It is unsettled whether making the product of a product-by-process claim by a process substantially different from the process steps recited in a product-by-process claim necessarily constitutes an infringement or anticipation of such claim. One panel of the Federal Circuit has indicated that a product-by-process claim is infringed even if the product is made by a different

process. <u>Scripps Clinic & Research Foundation v. Genentech, Inc.</u>, 927 F.2d 1565, 1583, 18 U.S.P.Q. 2d (BNA) 1001, 1016 (Fed. Cir. 1991).[1] In a subsequent case, a different panel of the Federal Circuit indicated that process terms in a product-by-process claim may limit such a claim. <u>Atlantic Thermoplastics Co., Inc. v. Faytex Corp.</u>, 970 F.2d 834, 23 U.S.P.Q.2d (BNA) 1481 (Fed. Cir. 1992), *reh'g in banc denied*.[2]

In a more recent case, <u>SmithKline Beecham Corp. v. Apotex Corp.</u>, 439 F.3d 1312 (Fed. Cir. 2006), the Federal Circuit declined to address the conflict over whether process steps in product-by-process claims are claim limitations and held that a product made thereby was anticipated by its disclosure in the prior art. SKB's `944 patent contained two product-by-process claims directed to the manufacture of a tableted form of paroxetine, a drug marketed as Paxil® used to treat depression. SKB's earlier `723 patent disclosed and claimed paroxetine in a pharmaceutically acceptable carrier. The district court relied on <u>Scripps Clinic & Research Foundation v. Genentech, Inc.</u>, 927 F.2d 1565 (Fed. Cir. 1991) in giving the process limitations of the claims no patentable weight, and held the claims anticipated because the product claimed in the `944 patent was the same product disclosed in the `723 patent. The Federal Circuit affirmed and noted:

> Contrary to the dissent's suggestion, the court does not hold that a claim to a product is never limited by process limitations. We simply hold that a prior art disclosure of a product precludes a future claim to that same product, even if it is made by an allegedly novel process. We take no position on whether a product-by-process claim is construed with reference to the process steps.

---

[1] Compare, <u>Cochrane v. Badische Anilin & Soda Fabrik</u>, 111 U.S. 293, 310, 4 S. Ct. 455, 28 L. Ed. 433 (1884); <u>Merrill v. Yeomans</u>, 94 U.S. 568, 572-73, 24 L. Ed. 235 (1876); <u>Application of Bridgeford</u>, 53 C.C.P.A. 1182, 357 F.2d 679, 682, 149 U.S.P.Q. (BNA) 55, 58 (1966)

[2] See D.J. DeBenedictis, "<u>Inconsistent Patent Rulings</u>," 78 A.B.A.J. 36 (Dec. 1992)

In her dissent, Circuit Judge Newman characterized the majority decision as an "extraordinarily mischievous holding" that demonstrated a lack of understanding of the differences between Scripps and Atlantic Thermoplastics and a "misunderstand[ing of]] the nature of anticipation." Judge Newman quoted E.P. Mirabel, Product-by-Process Claims: A Practical Perspective, 68 J. Pat. & Trademark Off. Soc'y 3 (1986), who identified the most prevalent types of product-by-process claims: "(1) claims where the product is defined by the way it is made; (2) claims to a product that is limited by process steps, and (3) claims where a process limitation is a "structural" part of the product (e.g., a molded plastic)." As Judge Newman pointed out, "failure to understand such distinctions led [the Federal Circuit] into debate at the time of Scripps Clinic & Research Foundation v. Genentech, Inc., 927 F.2d 1565 (Fed.Cir.1991), and Atlantic Thermoplastics Co. v. Faytex Corp., 970 F.2d 834 (Fed.Cir.1992), a debate that remains of concern to practitioners and courts."[3]

Judge Newman stressed that "It is not the law that process limitations in product claims are not claim limitations. It is not the law that process limitations are ignored in construing claims, whatever the nature of the invention. Claims state the invention for which a patent is sought. … All claims are construed in light of the specification: the observer looks to the specification to ascertain what has been invented, and understands the claim accordingly. See Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005) (en banc ) This rule is not suspended

---

[3] Columbia Univ. v. Roche Diagnostics GmbH, 126 F.Supp.2d 16, 31 (D.Mass.2000) (noting that after Scripps and Atlantic Thermoplastics, the district court is left in the unenviable position of choosing the better rule); DeKalb Genetics Corp. v. Northrup King Co., No. 96 C 50169, 1997 WL 587492, *2 (N.D.Ill. Aug.14, 1997) (finding that Scripps and Atlantic Thermoplastics are "in seeming conflict"); Tropix, Inc. v. Lumigen, Inc., 825 F.Supp. 7, 8 (D.Mass.1993) (noting the "disagreement" between Scripps and Atlantic Thermoplastics ); see also 3 Chisum on Patents § 8.05[1][b] ("Federal Circuit panel decisions in 1991 and 1992 differed over whether a product-by-process claim can be infringed by a product not made by a specified process."); Conflicts in Federal Circuit Patent Law Decisions, 11 Fed. Cir. B.J. 723, 765 (2002) (describing controversy)

when product and process limitations appear in the same claim. No precedent so requires, and no policy is served by this creative new rule." Judge Newman cited Helifix Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339, 1346 (Fed. Cir. 2000) and pointed out that "when the process limitations in a claim distinguish the invention as a whole from the prior art, when they are material to the invention as set forth by the inventor, the claim cannot be "anticipated" by prior art that does not have all of the limitations in the claim." She also quoted General Electric Co. v. Nintendo Co., 179 F.3d 1350, 1356-57 (Fed. Cir. 1999) reiterating an axiomatic concept that "to anticipate a claim, a reference must disclose every element of the challenged claim and enable one skilled in the art to make the anticipating subject matter."

In re Luck, 476 F.2d 650, 653 (CCPA 1973), the Court held that "to the extent these process limitations distinguish the product over the prior art, they must be given the same consideration as traditional product characteristics." That is, the process limitations cannot be ignored.

Applying the law correctly and following the learned reasoning of Judge Newman, the claims here at issue are clearly novel, not anticipated as a matter of law.

**C.    Structural Differences Between the Products Should be Taken Into Consideration**

As discussed above, in SmithKline, Judge Newman quoted E. P. Mirabel, Product-by-Process Claims: A Practical Perspective, 68 J. Pat. & Trademark Off. Soc'y 3 (1986). In that article, Mirabel identified three different types of product-by-process claims, one of them being claims where a process limitation is a "structural" part of the product (e.g., a molded plastic). The PTO regulations, specifically MPEP Sec. 2113, specifically require that the "structure implied by the process steps should be considered when assessing the patentability of product-by-process claims over the prior art, especially where the product can only be defined by the process steps

by which the product is made, or where the manufacturing process steps would be expected to impart distinctive structural characteristics to the final product. See, e.g., In re Garnero, 412 F.2d 276, 279, 162 U.S.P.Q. 221, 223 (CCPA 1979) (holding "interbonded by interfusion" to limit structure of the claimed composite and noting that terms such as "welded," "intermixed," "ground in place," "press fitted," and "etched" are capable of construction as structural limitations).

As discussed below, such structural limitations as "pressure-shucked" and "pressure-treated" should have been treated as structural limitations by the PTO because they impart features on the product that could not be produced by the method of the cited reference.

## V.    STATEMENT OF MATERIAL FACTS

Mr. Voisin filed a patent application on July 24, 1998, entitled "A Process of Elimination of Bacteria In Shellfish, of Shucking Shellfish and An Apparatus Therefor." Some claims of the application were allowed and are now issued as patent Nos. 6,217,435 and 6,393,977. The instant appeal resulted from an adverse decision by the Board of Patent Appeals and Interferences (BPAI) of February 24, 2006 (Exhibit 3) affirming examiner's rejection of Claims 5 and 27 – 38 under 35 U.S.C. §102(e) as being anticipated by the '064 patent. (Exhibit 2)

The instant invention relates to a post-pressurized bacteria-free raw shellfish (oysters and molluscan shellfish) that has been subjected to high pressure of a predetermined value (Claim 36), more specifically in the range of 20,000 p.s.i. and 50,000 p.s.i. (Claims 5, 32, 34, 38) to render the product substantially free from pathogenic naturally-occurring marine bacteria, while the sensory characteristics of raw shellfish are retained (Claims 5, 32). The post-pressurized raw shellfish is also pressure-shucked (Claims 5, 32, 34, 36).

The product is obtained by depositing the raw shellfish into a pressure vessel and pressurizing the vessel for a time period of between 1 and 15 minutes (Claims 27, 32, 37). Prior to and following the pressure treatment, the raw shellfish is retained at a temperature below ambient (Claim 28). In order to retain oyster juice in the shell, the shells are banded before depositing the shellfish into the pressure vessel (Claim 30). A particular bacteria that is eliminated from the shellfish is *V. Vulnificus* (Claims 31 and 33).

Tesvich '064 patent (Exhibit 2) teaches a method of heat treatment of raw molluscan shellfish, whereby the raw shellfish is "mildly" heated for the reduction to lower levels of harmful pathogenic bacteria (col. 2, lines 31 – 35). According to the '064 method, refrigerated shellfish is culled and banded by a synthetic rubber band (col. 2, lines 38 – 40). The banded product is lowered into a circulating bath of water heated to 110 – 140 degrees Fahrenheit (col. 5, lines 38 – 43). The treatment continues for 10 – 120 minutes, depending on the grade size of the product (col. 5, lines 43).

The banded product of the '064 patent is then placed in cold bath, then packed and refrigerated for storage and transportation (col. 2, lines 50 – 56). To serve the mollusk, the consumer removes the band, and "removes the shell per the known "raw bar" style mollusk preparation method (col. 3, lines 5 – 9).

Defendant contends that Tesvich et al in the '064 patent teach a raw shellfish product (oysters) free of pathogenic bacteria, such as *Vibrio Vulnificus*, that the product is banded and shucked. Defendant also contends that phrases such as "by exposing said raw shellfish to pressure" "are merely preferred methods of making the claimed product and as such are not given patentable weight."

The BPAI essentially affirmed examiner's reasoning and failed to properly evaluate substantial and credible evidence on the differences between the product produced according to the method of the asserted claims and the product that is produced by the method of the '064 patent. As discussed below, the Defendant's rejection of the claims was arbitrary, capricious, a clear abuse of discretion and should be reversed.

## VI.    ARGUMENT

This appeal addresses the proper interpretation of the product-by-process claims of the application-in-suit. The invention embodied in these claims solved a real-world problem - a problem that had presented a serious threat to food safety, public health and the very existence of commercial seafood processing. The Defendant, however, rejected the asserted claims contending that they are anticipated under 35 U.S.C. §102(e) by a single prior art reference.

In reaching this result, the Defendant ignored substantial and credible evidence not only on the differences between the products made by the asserted claims and the product made according to the claims of the cited reference, but also the concessions made by the inventor of the cited reference in a later filed document about the deficiencies of the product made according to the '064 patent. This ample evidentiary material should have precluded the BPAI from affirming examiner's rejection of the claims at issue here. Additionally, there exist structural differences in the product produced by the method of the '064 patent and the product-by-process claims of the instant application. The BPAI, however, bypassed each of these arguments based on an interpretation of product-by-process claims that failed to follow the Federal Circuit's precedent in Atlantic Thermoplastics Co., Inc. v. Faytex Corp., 970 F.2d 834, 846-47 (Fed. Cir. 1992), where the appellate court held that the process limitations of the product-by-process claim at issue - like all other limitations of a claim - should be considered by the decision-maker.

1.      **The Finding of Novelty of the Instant Claims Depends on the Correct Reading of <u>Scripps</u>, <u>Atlantic Thermoplastics</u> and <u>SmithKline</u>**

The first and mandatory step of any anticipation analysis is to interpret the claims at issue. <u>Helifix Ltd. v. Blok-Lok, Ltd.</u>, 208 F.3d 1339, 1346 (Fed. Cir. 2000). Here, the Defendant's decision was based on its misinterpretation of the product-by-process claims of the instant application. These claims basically recite a product, post-pressurized bacteria-free raw shellfish (oysters and molluscan shellfish) that has been subjected to high pressure of a predetermined value, more specifically in the range of 20,000 p.s.i. and 50,000 p.s.i. to render the product substantially free from pathogenic naturally-occurring marine bacteria, while the sensory characteristics of raw shellfish are retained. Additionally, the shellfish is pressure-shucked.

The Defendant, however, ignored the "post-pressurized," "subjected to high pressure" and "pressure-shucked" process limitations, interpreting Claim 5 as merely reciting a bacteria-free shucked raw molluscan product. In other words, the PTO interpreted the disclosure of the '064 patent as teaching essentially any bacteria-free shucked shellfish no matter how it was made. The PTO based its decision on the holding in <u>In re Hirao</u>, 535 F.2d 67 (CCPA) and <u>In re Wertheim</u>, 541 F.2d 257 (CCPA 1976).

The Defendant failed to take into consideration the recent decisions by the Court of Appeals for the Federal Circuit in <u>Atlantic Thermoplastics</u>, supra, reaching basically the same decision as the court in <u>Scripps</u>. The Plaintiff notes that neither <u>Scripps,</u> nor <u>SmithKline</u> are en banc decisions. Therefore, the Plaintiff's reliance on <u>Atlantic Thermoplastics</u> is fully justified.

2.      **Plaintiff Met the Burden of Establishing Unanticipated Structural Differences Between Plaintiff's Product and Prior Art Product**

Even assuming, *arguendo*, that the PTO's initial rejection of the asserted claims was proper, Plaintiff nevertheless met its burden (within the meaning of MPEP § 2113) and clearly

demonstrated that its product is different from any product that could be produced by the '064 patent. Moreover, such differences are clearly recognized by persons of ordinary skill in the art. The Plaintiff realizes that "as a practical matter, the Patent Office is not equipped to manufacture products by the myriad of processes put before it and then obtain prior art products and make physical comparisons therewith." In re Brown, 459 F.2d 531, 535, 173 U.S.P.Q. 685, 688 (CCPA 1972), MPEP § 2113. However, the PTO is obligated, as a matter of fairness, to accept and give credit to, evidentiary materials submitted by the Plaintiff, who had the equipment and resources to make the required manufacturing and testing and who did in fact make the necessary comparisons. The results of the testing were presented to several people who had more than "ordinary" knowledge in the field of marine biology and seafood processing.

It is axiomatic that to kill bacteria, one must deactivate or denature proteins of the bacterial organism. When using heat, such as the heating method of Tesvich '064 patent, the denaturing occurs once the bacterial cell reaches a certain pre-determined temperature. However, at the same temperature, new covalent bonds are likely to form. These bonds change the structure of the food product, irreversibly affecting the sensory characteristics of the food product.

The Plaintiff introduced the statement of Dr. Marilyn B. Kilgen, Professor and Head of the Department of Biological Sciences of Nicholls State University (Exhibit A). As Professor Kilgen explained, high-pressure processing of shellfish involves mechanical disruption of the non-covalent bonds that hold the tertiary structure of a protein together.

In contrast, heat processing (such as Tesvich et al's method) involves "melting" of the non-covalent bonds holding the tertiary structure of the protein together. This "melting" process is different from the mechanical disruption that occurs when shellfish, such as oysters, is

processed using high pressure. Professor Kilgen's statement provides evidence on the biological (structural) differences between a product processed by heat and a product processed by high pressure; it fully supports the Plaintiff's position that heat treatment causes irreversible changes in the structure of the protein food product, such as the oyster and that a shellfish product that has been treated by heat to eliminate bacteria inevitably has different sensory characteristics than a product treated by high pressure.

Moreover, Professor Kilgen's statement supports the Plaintiff position that the claimed terms, such as "post-pressurized" allow persons skilled in the art (in this case a person of more than ordinary skill in the art) to easily appreciate the distinction between a heated shellfish product (Tesvich '064) and a post-pressurized product of the instant claims. These terms provide sufficient information to the artisans in the field on the structure and biological features possessed by the shellfish products as a result of exposing the products to the different processes. The Plaintiff also introduced a letter from Drs. Jon W. Bell and J. David Bankston (Exhibit B). Both are Professors at Louisiana State University, Department of Food Science. The former is Assistant Professor in Seafood Technology, and the latter is Professor of Food Science. Both Dr. Bell and Dr. Bankston have intimate knowledge of seafood industry and food technologies.

It is well-known in the industry that John Tesvich is the President and co-owner of several Louisiana companies named AmeriPure Processing, AmeriPure Patent Holding, Inc. and others.[4] The Tesvich process of mild heat treatment is therefore referred to in several declarations as Ameripure process. Drs. Bell and Bankston stated that the oysters treated by heat

---

[4] See, for instance, records of the Louisiana Secretary of State Office listing John Tesvich of 30300 Hwy. 23 South, Buras, LA 70041 as the registered agent of AmeriPure Processing Co., Inc.; records accessible at http://www400.sos.louisiana.gov/cgibin?rqstyp=crpdtlC&rqsdta=34504472D (last visited October 22, 2007); John Tesvich of 30300 Hwy. 23 South, Buras, LA 70041 as the registered agent and director of AmeriPure Patent Holding, Inc., records accessible at
http://www400.sos.louisiana.gov/cgibin?rqstyp=crpdtlC&rqsdta=34880407D (last visited October 22, 2007)

according to Tesvich (Ameripure) method did not result in release of the adductor muscle and that manual shucking was required as a post-post treatment. In contrast, the claimed invention produces a structurally different product, a pressure-shucked product, where the adductor muscle of an oyster is released without resort to manual shucking.

This statement is supported by the disclosure of the '064 patent that deals with "the known raw bar method" described in col. 3, lines 5 – 9. The known raw bar method is mechanical opening of the shells, whereby a bartender pries open the shell halves with a knife. The product requiring mechanical opening of the shell is structurally not the same product that has been pressure-shucked, as claimed in the instant application.

Drs. Bell and Bankston further state that their conclusion is supported by the recent studies conducted by the LSU Department of Food Sciences, specifically by Dr. Jimmy Xu. The studies involved evaluation of fatty acids as the building blocks of lipids, the substances that affect physiological functioning of an organism, such as oysters, after harvest. Dr. Xu's studies confirmed that the product produced according to the Voisin method of high pressure processing (HPP) is different from untreated oysters and oysters treated using heated water/chilled water method of Tesvich et al. (Ameripure, Inc.) (Exhibit C)

Moreover, food products treated by Tesvich '064 patent method and food products treated by the Plaintiff's method were the subject of a sensory test performed by Dr. Godber with the help of student panelists. These tests further support the Plaintiff's statements that sensory characteristics of the product produced by HPP are different from the sensory characteristics of the heat-treated product of Tesvich et al.

The applicant further submits Declaration under 37 CFR 1.132 signed by Christopher Lee Nelson (Exhibit D), a person having more than ordinary skill in art of seafood biology,

microbiology and industry. Mr. Nelson is a member of National Fisheries Institute, Molluscan Shellfish Institute, National Shellfisheries Association and other respected organizations dealing with seafood growing, processing and sanitation.

As Mr. Nelson stated, he was intimately familiar with the product produced by the Tesvich et al's patent and with the product produced by the Plaintiff's method. According to Mr. Nelson, the heat method of Tesvich et al is difficult to control due to wide irregularities of the treated product (differences in shell thickness, density and size). To kill bacteria in a batch of oysters having different shells the product must be treated at the higher level of temperature to ensure that thicker and denser shelled oysters are properly treated. Higher heat causes overcooking of less dense oysters, resulting in drying of edges and protein degradation.

Still further, when manually shucked after heat treatment according to Tesvich patent, oysters exhibit inconsistency in taste and appearance (Exhibit D, page 2).

In contrast, the product of the instant claimed invention is a "post-pressurized raw shellfish that is pressure-shucked and free from pathogenic naturally-occurring marine bacteria" and where sensory characteristics of raw shellfish have been retained. The product retains its consistency in taste, texture and appearance (Exhibit D, page 2).

The Plaintiff also attaches Section 132 Declaration of Mr. Alfred R. Sunseri (Exhibit E), a person with more than twenty years experience in the oyster processing and distribution industry, active member of Louisiana Oyster Dealers and Growers Association, Louisiana Oyster Task Force, Gulf Oyster Industry Council and the Interstate Shellfish Sanitation Conference. Mr. Sunseri is familiar with the Tesvich et al's patent and the instant application. Mr. Sunseri states that a product produced according to Tesvich et al's patent and the Plaintiff's product are different in taste, texture and appearance (Exhibit E, page 3). Mr. Sunseri confirmed that due to

18

difficulty of controlling the Tesvich process, one can see curling and shrinking of the edges of the meat in less dense-shell oysters; that protein degradation can produce partially cooked product.

Mr. Sunseri's statements are further proof that persons of more than ordinary skill in the art can clearly see the distinctions between the mildly heat-treated product of Tesvich et al and the post-pressurized product of the claimed invention.

### 3.    The Inventor of the '064 Patent Acknowledged That Heat Treatment Structurally Alters the Product in a Later-Issued Patent

The Plaintiff submitted a later issued Tesvich et al's patent, patent No. 5,976,601 (Exhibit 4), which is also directed to a method of mild heat treatment of oysters in their natural shell. In the '601 patent Tesvich et al acknowledge that heating oysters in the their shells to temperatures above 53° C (127.4° F) causes edges of the meat to curl and shrink due to protein degradation, cooking the oyster (see, col. 4, lines 27 – 40). Therefore, Tesvich et al. admit that a process whereby oysters are treated in water bath of up to 140° Fahrenheit (60° C), as disclosed and claimed in the '064 patent, produces cooked oysters.

The PTO misinterpreted the conflicting disclosures of the two Tesvich patents by delegating the inconsistencies to the necessary experimentation that one has to undergo to practice the Tesvich method. Such reasoning is not credible and not convincing. If later admissions of the same inventors clearly indicate that at least a portion of the '064 patent is non-enabling, the PTO should have taken the admission into consideration and not cite every unsupported statement of the '064 patent against the Plaintiff's field-tested and proven data.

Further, in the '601 patent, Tesvich et al acknowledge that heat treatment whereby internal temperature of the shelled product is less than 49° C (120.2° F) does not kill *V. Vulnificus*. (col. 4, lines 30 – 35). Therefore, Tesvich et al admit that a process, which claims

*Vibrio* elimination at temperature of fluid bath of 110° F (43.3° C), as is disclosed and claimed in the '064 patent, is not supported by later tests performed by the inventors of the '064 patent. The later Tesvich patent leaves a small 4-degree window of the internal oyster meat temperature for a process to work. According to the new data in the '601 patent, the water bath temperature must be between 49° C and 55° C (120.2 – 131° F).

Moreover, according to the '601 patent, continuous random testing **during actual processing** is needed to ensure quality control (col. 4, lines 41-43). In other words, even the new process is so unpredictable that unless frequent tests during processing are done, one cannot ensure the uniform results in any given batch. The same is necessarily true for the process of the '064 patent.  The BPAI erroneously relied on the statement in the '064 patent to the effect that the oysters are graded by size prior to the heat treatment when attacking one of the declarations produced by the Plaintiff. If the continuous random testing is required during the actual process of Tesvich then the preliminary grading makes no difference. The process is still unreliable and cannot be reproduced without undue experimentation.

The above-discussed evidentiary materials support the inevitable conclusions that:

1. Tesvich et al's '064 patent does not disclose a practical method of elimination of *Vibrio Vulnificus;*

2. Product produced according to at least some of the criteria of the '064 patent produces a cooked product;

3. Undue experimentation is required to follow the '064 patent to achieve the claimed result;

4. Product produced by the heat method of the '064 patent and the claimed product are different in taste, texture and appearance;

5.  Product of the '064 patented process does not produce a shucked oyster;

6.  Product of the instant invention is structurally different from the product of the '064 patent.

PTO's statements that the method phrases stated in the claims are "merely preferred methods of making the claimed product" are improper since the PTO apparently relied on the method steps recited in the '064 patent to derive or re-construct the "product" features of the Tesvich et al's product. The Plaintiff particularly points out that the claims of the Tesvich '064 patent do not recite any product but are rather directed to the steps of processing raw molluscan shellfish. It is only by flawed reconstruction of the text of the cited reference that the PTO arrived at the alleged inventive product made by the '064 patent.

 In view of the above, the Plaintiff respectfully submits that the PTO failed to establish a prima facie case of anticipation of the asserted Claims 5 and 27-38. Even assuming that the PTO did in fact meet its burden, the applicant presented sufficient, credible and uncontroverted evidence sufficient to traverse the PTO's rejection of the claims. The BPAI's actions of rubber-stamping examiner's conclusory statements and findings of fact are nothing short of arbitrary, capricious, an abuse of discretion unsupported by substantial evidence. In view of the above, the Plaintiff is entitled to judgment as a matter of law in its favor.

## VII.    CONCLUSION

The BPAI erroneously found that the examiner established prima facie case of anticipation based on the references and evidence in the record. Even if the examiner has made the initial showing of anticipation, the Plaintiff successfully traversed the initial rejection of the claims and presented evidence that the teachings of the prior art do not amount to anticipation. Moreover, the uncontroverted statements of persons of skill in the art prove that the Plaintiff

rebutted the PTO's case of prima facie anticipation. Therefore, the actions/findings of fact of the BPAI are arbitrary, capricious, contrary to the evidence and constitute a clear abuse of discretion.

For the foregoing reasons, Plaintiff respectfully requests that the Court enter summary judgment in favor of the Plaintiff and direct the Patent Office to issue a Notice of Allowance of the asserted Claims 5 and 27 – 38 forthwith.

Respectfully submitted,


/s/Thomas S. Keaty
Thomas S. Keaty, *Pro Hoc Vice*
Attorney for Plaintiff
KEATY PROFESSIONAL LAW CORPORATION
2140 World Trade Center
No. 2 Canal Street
New Orleans, LA 70130
(504) 524-2100
(504) 524-2105 (fax)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| INNOVATIT SEAFOOD SYSTEMS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-0825(JR) |
| | ) | |
| COMMISSIONER FOR PATENTS, | ) | |
| | ) | |
| Defendant. | ) | |

**STATEMENT OF UNCONTESTED FACTS IN SUPPORT OF INNOVATIT SEAFOOD SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO LOCAL RULE LCvR7(h)**

Pursuant to Local Rule LCvR7(h), Plaintiff, Innovatit Seafood Systems, Inc. ("Innovatit" or "Plaintiff") hereby submits the following statement of uncontested facts in support of its Motion for Summary Judgment that Claims 5 and 27 - 38 of its application Serial No. 09/949,704 ("application-in-suit") are not anticipated by U.S. Patent No. 5,773,064 (Tesvich or "the '064 patent").

Innovatit Seafood Systems, Inc. is the plaintiff in this lawsuit. The real party in interest is the current assignee of the application-in-suit, Avure Technologies, Inc. of Kent, Washington. (Exhibit 5, Assignment)

1.     Application-in-suit is application Serial No. 09/949,704 filed on September 10, 2001 by Ernest A. Voisin. (Exhibit 1)

2.     Avure Technologies, Inc. ("Avure") is the owner of all right, title and interest in and to the application-in-suit. (Exhibit 5)

3.     On February 24, 2006, the Board of Patent Appeals and Interferences (BPAI) of the U.S. Patent Office ("PTO") affirmed rejection of Claims 5 and 27-38 of the application-in-suit. (Exhibit 4)

1

4.     In its decision, BPAI stated that Claims 5 and 27-38 are anticipated by the '064
       patent. (Exhibit 3)

5.     Claim 5, an independent claim, is directed to a post-pressurized raw shellfish that
       is pressure-shucked and free from pathogenic naturally-occurring marine bacteria
       and which has undergone treatment by exposing said raw shellfish to pressure of
       about between 20,000 p.s.i. and 50,000 p.s.i., said raw shellfish retaining sensory
       characteristics of raw product. (Exhibit 1, p. 19)

6.     Claim 27, which depends on Claim 5 recites that the raw shellfish is treated by
       depositing said raw shellfish into a pressure vessel loaded with a pressure
       transmitting fluid and pressurizing the vessel for a period of between 1 and 15
       minutes to thereby eliminate pathogenic naturally occurring marine bacteria in
       said raw shellfish. (Exhibit 1, p. 19)

7.     Claim 28, dependent on Claim 5, recites a limitation of the raw shellfish being
       retained at a temperature below ambient temperature prior to and following
       treatment in the pressure vessel. Exhibit 1, p. 19

8.     Claim 29, also dependent on Claim 5, recites that said raw shellfish are oysters
       and molluscan shellfish. (Exhibt 1, p. 19)

9.     Claim 30, which depends on Claim 29, recites that a flexible detachable band is
       placed over said oysters prior to depositing said oysters in said pressure vessel for
       retaining bodies of oysters and molluscan shellfish and juices in shells. (Exhibt 1,
       p. 19)

10.  Claim 31, which depends on Claim 5, recites that the raw shellfish is retained in said pressure vessel for a period of time sufficient to eliminate *Vibrio Vulnificus* bacteria in said raw shellfish.  (Exhibt 1, p. 19)

11.  Claim 32, an independent claim, recites a post-pressurized raw shellfish that is pressure-shucked and free from pathogenic naturally-occurring marine bacteria and which has undergone treatment for elimination of pathogenic naturally-occurring marine bacteria by depositing said raw shellfish into a pressure vessel loaded with a pressure transmitting fluid and pressurizing the vessel to between about 20,000 p.s.i. and about 50,000 p.s.i. for a period of 1 to 15 minutes, thereby eliminating pathogenic bacteria in said raw shellfish, while retaining sensory characteristics in said raw shellfish, and then retaining said raw shellfish at a predetermined temperature below ambient. (Exhibt 1, p. 19)

12.  Claim 33, which depends on Claim 32, and similar to Claim 31, recites that the raw shellfish is retained in said pressure vessel for a period of time sufficient to eliminate *Vibrio Vulnificus* bacteria in said raw shellfish.  Exhibit 1, p. 20

13.  Claim 34, an independent claim, recites a post-pressurized raw shellfish, which is pressure-shucked and is substantially free from pathogenic naturally-occurring marine bacteria and which has undergone pressure treatment to eliminate the pathogenic naturally-occurring marine bacteria and shuck said raw shellfish, said raw shellfish retaining sensory characteristics of raw shellfish by depositing said raw shellfish into a pressure vessel loaded with a pressure transmitting fluid and pressurizing the vessel to between 20,000 p.s.i. and 50,000 p.s.i. for a period of 1 to 15 minutes. (Exhibit 1, p. 20)

14.    Claim 35, dependent on Claim 34, recites that the raw shellfish is shucked by causing release of an adductor muscle of said raw shellfish. (Exhibit 1, p. 20)

15.    Claim 36, an independent claim, recites a post-pressurized pressure-shucked and bacteria-free raw shellfish product having sensory characteristics of a raw product that has been pressurized for a predetermined period of time to a predetermined pressure value above atmospheric pressure. (Exhibit 1, p. 20)

16.    Claim 37, dependent on Claim 36, recites that the predetermined period of time is between about 1 minute and 15 minutes. (Exhibit 1, p. 20)

17.    Claim 38, which depends on Claim 36, recites that the predetermined pressure value is between about 20,000 p.s.i. and about 50,000 p.s.i. (Exhibit 1, p. 20)

18.    Tesvich '064 patent teaches a method of heat treatment of raw molluscan shellfish, whereby the raw shellfish is "mildly" heated for the reduction to lower levels of harmful pathogenic bacteria. Refrigerated shellfish is culled and banded by a synthetic rubber band; then lowered into a circulating bath of water heated to 110 – 140 degrees Fahrenheit. The treatment continues for 10 – 120 minutes, depending on the grade size of the product. The banded product is then placed in cold bath, then refrigerated for storage and transportation. To serve the mollusk, the consumer removes the band, and removes the shell per the known "raw bar" style mollusk preparation method, i.e. by cutting the adductor muscle with the knife. (Exhibit 2)

19.    Tesvich '064 does not teach a post-pressurized product. (Exhibit 2)

20.    Tesvich '064 does not teach a pressure-shucked product. (Exhibit 2)

21.    Tesvich '064 does not teach a bacteria-free product. (Exhibit 2)

22.    Tesvich '064 does not teach a post-treatment product that has sensory characteristics of raw product.

23.    Tesvich et al.'s patent No. 5,976,601 (Exhibit 4), acknowledges that heating of oysters in the their shells to temperatures above 53° C (127.4° F) causes edges of the meat to curl and shrink due to protein degradation, cooking the oyster. (Exhibit 4, Column 4)

24.    Tesvich et al's '601 patent acknowledges that heat treatment whereby internal temperature of the shelled product is less than 49° C (120.2° F) does not kill *Vibrio vulnificus*. (Exhibit 4, Column 4)

25.    Manual of Patent Examining Procedure Sec. 2113 requires that the PTO consider process limitations in the product-by-process claims as structural limitations.

26.    Dr. Kilgen, identified the differences between a product made according the heat processing (such as Tesvich et al's method), which involves "melting" of the non-covalent bonds holding the tertiary structure of the protein together and pressure-treated product (like the product of the asserted claims), which involves mechanical disruption of the protein structure of the molluscan shellfish. (Exhibit A)

27.    Drs. Jon W. Bell's and J. David Bankston's statement confirms that the oysters treated by heat according to Tesvich (Ameripure) method did not result in release of the adductor muscle and that manual shucking was required as a post-post treatment. (Exhibit B)

28.    Dr. Xu's studies confirmed that the product produced according to the applicant's method of high pressure processing (HPP) is different from untreated oysters and

oysters treated using heated water/chilled water method of Tesvich et al. (Ameripure, Inc.)

29. Mr. Nelson confirmed that when oysters were manually shucked after heat treatment according to Tesvich patent, oysters exhibited inconsistency in taste and appearance. (Exhibit C)

30. Mr. Sunseri declared that he tasted the Voisin oyster that was processed as described in his application No. 09/949,704. The final product was consistent in taste and appearance in several oysters, in contrast to marked inconsistency in taste and appearance of several oysters made by the Tesvich patent #5,773,064. The Voisin oysters did not have a change in the taste or texture of the raw oyster. The oysters were perfectly shucked during the process, every time, with every batch. (Exhibit D)

31. Mr. Sunseri also declared that the "Tesvich oyster may also have been bacteria free but this is what one would expect to happen when heat treatment is applied to raw shellfish." (Exhibit D)

32. Mr. Sunseri further declared that "even though Tesvich speaks of "mild" heat treatment it is my belief that heat would necessarily change the structural characteristics of the shellfish proteins thus necessarily resulting in the altered product that can no longer be characterized as raw." (Exhibit D)

33. The PTO did not produce any affidavit from a person skilled in the art regarding anticipation of the asserted Claims 5 and 27 - 38.

Respectfully submitted,

/s/Thomas S. Keaty
Thomas S. Keaty, *pro hac vice*
Attorney for Plaintiff
Keaty Professional Law Corporation
2140 World Trade Center
No. 2 Canal Street
New Orleans, LA 70130
(504) 524-2100
(504) 524-2105 (fax)