# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| INNOVATIT SEAFOOD SYSTEMS, LLC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 06-0825 (JR) |
| | ) | |
| DIRECTOR, UNITED STATES PATENT AND TRADEMARK OFFICE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## OR, IN THE ALTERNATIVE, FOR DISMISSAL AND REMAND

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant, the Director of

the  United States Patent and Trademark Office ("USPTO" or "Defendant") respectfully moves

that summary judgment be entered in favor of Defendant, or, in the alternative, that the case be

dismissed and remanded to the USPTO for further consideration.  Plaintiff Innovatit Seafood

Systems, LLC ("Innovatit" or "Plaintiff") brought the present action pursuant to 35 U.S.C. § 145

challenging the decision of the USPTO's Board of Patent Appeals and Interferences ("Board"),

which affirmed the rejection of claims 5 and 27-38 of Innovatit's U.S. Patent Application Serial

No. 09/949,704 ("the '704 application") as unpatentable under 35 U.S.C. § 102(e).  As set forth

in the Memorandum of Points and Authorities in support of this motion, there are no material

facts in genuine dispute as to the unpatentability of the '704 application under 35 U.S.C. §

102(e), and Defendant is entitled  to judgment as a matter of law.  Alternatively, Defendant

respectfully requests that the matter be remanded to the USPTO for consideration of an

additional prior art reference, not yet considered by the Board, that strongly supports a

determination of unpatentability of the pending claims under 35 U.S.C. §§ 102 and 103.  A

memorandum of points and authorities and proposed order are submitted herewith.

Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_____/s/_____
RUDOLPH  CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


_____/s/ Robin M. Meriweather_____
ROBIN M. MERIWEATHER, D.C. Bar # 490114
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202/514-7198
202/514-8780 (facsimile)

**Of Counsel:**

STEPHEN WALSH
Acting Solicitor

BENJAMIN D. M. WOOD
JANET GONGOLA
Associate Solicitors
United States Patent and Trademark Office

Dated: November 2, 2007

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| INNOVATIT SEAFOOD SYSTEMS, LLC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 06-0825 (JR) |
| | ) | |
| DIRECTOR, UNITED STATES PATENT AND TRADEMARK OFFICE, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**STATEMENT OF MATERIAL FACTS IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 7(h), Defendant submits this statement of facts as to which there is no genuine issue.

1.      On September 10, 2001, Ernest A. Voisin filed U.S. patent application Serial No. 09/949,704 ("the '704 application") for "A process of Elimination of Bacteria in Shellfish, of Shucking Shellfish and An Apparatus Therefor."  R3, R4-30.

2.      The '704 application is a continuation of U.S. Application No. 09/524,444, which in turn is a divisional of U.S. Application No. 09/121,725 ("the '725 application"), filed on July 25, 1998.  R1, 4.

3.      The specification of the '704 application discloses a process for eliminating harmful bacteria in shellfish, such as oysters, by exposing the shellfish to high pressure for a limited period of time, without applying heat.  R11.

4.      The specification notes that bacteria from the *Vibrio* genus, such as *Vibrio vulnificus*, which are found in warm coastal waters around the U.S., are of particular concern.

R4.  Eating raw oysters infected by the *Vibrio vulnificus* bacteria may cause food poisoning that, in rare cases, is fatal.  R5.  According to the specification, the claimed high pressure process kills the bacteria on the surface of or harbored within the shellfish, without destroying the "sensory qualities" of raw shellfish.  R12.

5.     The specification also teaches that treating raw shellfish with high pressure assists in "shucking" the shellfish, that is, opening the shells of the shellfish.  R14.  The specification notes that oysters treated with high pressure were much easier to shuck because the high pressure causes the adductor muscles that hold the two shell halves together to disengage from the shells, allowing the shells to be easily opened by hand.  *Id.*

6.     Claims 5 and 27-38 are at issue in this appeal.  R169.

7.     Claim 5 recites a raw, "pressure-shucked" oyster that is free from harmful bacteria:

> A post-pressurized raw shellfish that is pressure-shucked and free from pathogenic naturally-occurring marine bacteria and which has undergone treatment by exposing said raw shellfish to pressure of about between 20,000 p.s.i. and 50,000 p.s.i., said raw shellfish retaining sensory characteristics of raw product.

R169.

8.     Claim 5 is written in the form of a "product-by-process" claim.

9.     Claims 27-35 and 38 claim various other aspects of a raw, "pressure-shucked" shellfish.  Some of these claims further specify the time during which the shellfish are to be pressurized, *i.e.*, between 1 and 15 minutes, the type of shellfish to be treated (*e.g.* oysters), the use of "flexible bands" around the shellfish during treatment, and the specific bacteria to be eliminated from the shellfish.  R169-70.  For example, claim 32 reads:

2

> A post-pressurized raw shellfish that is pressure-shucked and free
> from pathogenic naturally-occurring marine bacteria and which has
> undergone treatment for elimination of pathogenic naturally-
> occurring marine bacteria by depositing said raw shellfish into a
> pressure vessel loaded with a pressure transmitting fluid and
> pressurizing the vessel to between about 20,000 p.s.i. and about
> 50,000 p.s.i. for a period of 1 to 15 minutes, thereby eliminating
> pathogenic bacteria in said raw shellfish, while retaining sensory
> characteristics if [*sic, of*] said raw shellfish, and then retaining said
> raw shellfish at a predetermined temperature below ambient.

R169.

10.    The examiner rejected claims 5 and 27-38 in an office action dated February 22,

2002.  R52-55.  The examiner explained that the pending claims were anticipated by an earlier-

issued patent:  U.S. Patent No. 5,773,064 issued to John Tesvich et al. ("the Tesvich '064 patent"

or "Tesvich '064").

11.    In rejecting claims 5 and 27-38, the examiner stated:

> Tesvich et al teach a raw shellfish product free of pathogenic
> bacteria (column 2, line 66 to column 3, line 4), the shellfish being
> an oyster (column 3, line 12), a flexible band (Figure 2, 52), the
> bacteria including Vibrio Vulnificus (column 1, line 12), the
> shellfish being at a refrigerate [*sic*] temperature (column 6, lines 8-
> 14), and the shellfish being shucked (column 3, lines 5-9).

R54.

12.    The examiner also recognized that the pending claims were specifically drawn to

products, and thus could be anticipated by any product having the same characteristics of the

claimed product, regardless of whether the prior-art product was produced in the same manner as

the claimed product:

> Phrases such as "by exposing said raw shellfish to pressure . . ."
> are merely preferred methods of making the claimed product and
> as such are not given patentable weight.

3

*Id.*

13.    The examiner rejected the pending claims in a final office action dated July 16, 2002, for essentially the same reasons as stated in the February 22, 2002 office action.  R71-2.

14.    The Tesvich '064 patent issued on June 30, 1998, from an application filed on March 22, 1996.  R56-A.

15.    The Tesvich '064 patent discloses a method of destroying *Vibrio vulnificus* bacteria in molluscan shellfish.  R56-A - H.  This method uses "mild heat treatment" followed by rapid cool-down and cold storage.  R56-E, col. 2, lines 31-36 col. 5, line 57 - col. 6, line 7.  The mollusks have a band placed around the shells to keep them closed during treatment; the mollusks are then heated by, for example, being placed in a circulating bath of warm water having a temperature of between about 110 °F and 140 °F.  R56-G, col. 5, lines 14-18, 42-47.  The shellfish remain in the warm water bath for between about 10 to 120 minutes, depending on the size of the mollusks being treated and the temperature of the warm water bath.  *Id.*, col. 5, lines 44-47.  The treatment duration and temperature are selected so as to not cook the shellfish.  *Id.*, col. 5, lines 50-52.  Finally, the mollusks are removed from the water bath, quickly cooled in a cold-fluid bath, and refrigerated.  *Id.*, col. 5, line 57 - col. 6, line 11.  When consumed, the mollusks retain their "natural flavor and raw texture."  *Id.*, col. 6, lines 15-18.

16.    Tesvich '064 discloses shucking treated oysters prior to consumption per the "raw bar" style mollusk preparation method.  R56-F, col. 3, lines 5-9; R56-H, col. 8, lines 16-18.

17.    Innovatit appealed the examiner's final rejection to the Board of Patent Appeals and Interferences ("Board").  R115.

18.    In support of its appeal to the Board, Innovatit cited the following evidence:

4

    a.      The Tesvich '601 patent.  R182-88.

    b.      A Letter from Dr. Marilyn B. Kilgen, Professor and Head of the

Department of Biological Sciences of Nicholls State University ("Kilgen Letter").

R171-72.

    c.      A letter from Drs. Bell and Bankston, Professors of Seafood Technology

at LSU ("Bell-Bankston Letter").  R173-74.

    d.      The declarations of Christopher Lee Nelson and Alfred R. Sunseri, which,

except for the introductory paragraphs, are identical ("The Nelson and Sunseri

Declarations").  R175-181.

    e.      Studies performed by Dr. Jimmy Xu.  R173-4.  Dr. Xu tested different

oysters for fatty acid composition and showed that the fatty acid profile of

"Motivatit's" oyster is different from both raw untreated oysters and

"Ameripure's" oyster.  R174.

19.    In the Kilgen Letter, Dr. Kilgen "explain[s] the difference in protein denaturation

in raw oysters using heat versus using hydrostatic high pressure."

20.    In the Bell-Bankston Letter, Drs. Bell and Bankston allege that the final product

oyster resulting from the high-pressure "Motivatit" process is different from that resulting from

the thermal "Ameripure" process.  R173.

21.    The Nelson and Sunseri Declarations are identical except for introductory

paragraphs that set forth each declarant's educational background and experience with oysters.

R175-181.

22.    The Nelson and Sunseri Declarations state that the Tesvich process is "difficult to

control because of the lack of uniformity of the oysters being processed." R176, R179. They also reiterate that oysters that have been treated by the Tesvich process must be mechanically shucked by hand with a knife, and allege that as a result such oysters are "inconsistent in taste and appearance." R176-A, R180.

23.    The Tesvich '601 patent discloses a refinement of the mild-heat-treatment process disclosed in the Tesvich '064 patent, specifically for oysters. The major refinement is the teaching that the water temperature and heat-treatment duration are chosen to ensure that the internal oyster-meat temperature is brought to between 49 °C and 53 °C (120 °F - 127.4 °F). R185, col. 1, lines 52-56. This is generally accomplished when the water bath is between 49 °C and 55 °C (120 °F - 131 °F) and the heat-treatment step lasts between ten and 45 minutes, depending on the size of the oysters being treated. *Id.* The Tesvich '601 patent teaches that an internal oyster-meat temperature of at least 49 °C is necessary to kill the *Vibrio vulnificus* bacteria, but that the oyster must be kept at 53 °C or below to avoid cooking the oyster. R186, col. 4, lines 31-39.

24.    The Tesvich '601 patent also discloses that the mild-heat-treatment process causes the abductor muscle of the oyster body to relax, making the oyster easier to shuck. This results in most of the muscle remaining with the oyster body after shucking. R187, col. 6, lines 36-45.

25.    Japanese Patent No. 4,356,156 to Miura Yasushi et al. ("JP '156" or "Yasushi *et al.*") discloses a high-pressure treatment process for raw shellfish that is substantially the same as that disclosed in the '704 application. R242-3.

26.    JP '156 was published on December 9, 1992. Exh. A at R1145.

6

27.    JP '156 teaches a method of shucking raw shellfish, such as oysters, by exposing them to pressures of between about 1000 and 4000 "normal atmospheres" for a period of about 0.5 minutes and 10 minutes.  Exh. A at R1147.

28.    One "normal atmosphere" is equivalent to 1 Kg/cm$^2$, which is equivalent to 14.22 psi.  R1147; CRC HANDBOOK OF CHEMISTRY AND PHYSICS F-319 (63rd ed. 1982).

29.    The process described in JP'156 renders oysters easy to open but still raw.  Exh. A at 1150.

30.    The pressure and time parameters taught by JP '156 (14,223 psi to 56,892 psi for 0.5 to 10 minutes) substantially overlap those taught in the '704 application (20,000 p.s.i. to 50,000 p.s.i. for a period of 1 to 15 minutes).

31.    JP '156 discloses a specific embodiment, "Embodiment 1," in which (i) oysters in the shell are placed in a plastic bag with sea water; (ii) the bag is sealed and placed in a high-pressure processing device; and (iii) a pressure of about 42,660 psi (3000 normal atmospheres) is applied to the oysters for three minutes.

32.    The Board found claim 5 to be representative of the appealed claims, and characterized the product of claim 5 as (1) post-pressurized and pressure-shucked; (2) free from pathogenic naturally occurring marine bacteria; and (3) retaining the sensory characteristics of a raw oyster. R236.

33.    The Board found that the Tesvich '064 patent discloses a raw shellfish product that is (1) shucked; (2) free from harmful pathogenic bacteria; and (3) raw, *i.e.*, that retains its natural flavor and raw texture.  R236.  The Board further held that it does not matter that the product of the Tesvich '064 patent is heat-treated and manually shucked rather than pressurized

and pressure-shucked. R237-42.

34.    The Board found unpersuasive Innovatit's reliance on the Tesvich '601 patent to show that shellfish produced by the process of the Tesvich '064 patent are not bacteria-free and are cooked. The Board pointed out that Tesvich 064 repeatedly teaches that the shellfish product remains in a raw, uncooked state following treatment. R237 (citing R56-F, col. 3, lines 61-65; R56-G, col. 5, lines 50-52). The Board also noted that the Tesvich process reduced the bacteria on treated oysters to an undetectable level. *Id.* (citing R56-E-F, col. 2, lines 44-46; col. 2, line 66 - col. 3, line 4).

35.    The Board then considered the remaining evidence submitted by Innovatit and found it equally unpersuasive. R239. Specifically, the Board found that the Kilgen Letter and the Bell-Bankston Letter addressed heat and pressure treatments in general and did not specifically address either the claimed invention or the process of the Tesvich '064 patent. R239-40.

36.    The Board also observed that the Bell-Bankston Letter admits that both the Motivatit process and Ameripure process result in a shellfish that is "*vibrio*" free, but state that, unlike the Motivatit process, the Ameripure process still requires mechanical shucking. R240.

37.    The Board likewise found that the Xu Studies and the Nelson and Sunseri Declarations failed to explain the process used to produce the oysters tested. R240-41.

38.    The Board found that the statements in the Nelson and Sunseri Declarations about the Tesvich process being "very difficult" to control were counter to the teachings of the Tesvich '064 patent, because the Tesvich '064 patent taught sorting oysters by size prior to treatment. R241.

39.    Finally, the Board opined that the examiner should consider the patentability of claimed subject matter in view of Japanese Patent No. 4,356,156 to Miura Yasushi et al. ("JP '156" or "Yasushi") in the event of further prosecution in the '704 application.  R242-3.

Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_____/s/_____
RUDOLPH  CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


_____/s/ Robin M. Meriweather_____
ROBIN M. MERIWEATHER, D.C. Bar # 490114
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202/514-7198
202/514-8780 (facsimile)

Of Counsel:

STEPHEN WALSH
Acting Solicitor

BENJAMIN D. M. WOOD
JANET GONGOLA
Associate Solicitors
United States Patent and Trademark Office

Dated: November 2, 2007

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INNOVATIT SEAFOOD SYSTEMS, LLC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 06-0825 (JR) |
| | ) |
| DIRECTOR, UNITED STATES PATENT AND TRADEMARK OFFICE, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR DISMISSAL AND REMAND

### INTRODUCTION AND SUMMARY

The Defendant, Director, U.S. Patent and Trademark Office ("USPTO" or "Defendant"), respectfully submits this memorandum of points and authorities in support of its motion for summary judgment. The Board of Patent Appeals and Interferences ("Board") found that the claims at issue in this patent case are unpatentable under 35 U.S.C. § 102(e) because they are anticipated. The Board's decision is supported by substantial evidence, and summary judgment should therefore be entered for Defendant.

Plaintiff Innovatit Seafood Systems, LLC ("Innovatit") filed a patent application which included claims for a shellfish, such as an oyster, that is exposed to high pressure, raw, free from harmful bacteria, and "pressure-shucked." To be patentable, a claim must be novel, *i.e.*, not anticipated under prior art. It is undisputed that, as a matter of law, Innovatit's product may be anticipated by a prior disclosure of the same product, regardless of the method by which the

prior product is made.  The Board found that a prior art reference (the Tesvich '064 patent) teaches a method – a mild heat treatment process –  that produces an oyster that is raw, free from bacteria, and shucked by hand.  Thus, the Board found that the Tesvich '064 patent discloses a raw, shucked, disinfected oysters, just like the product claimed in Innovatit's application.  This finding is supported by substantial evidence and the Board's decision should be affirmed.

In the alternative, the Court should dismiss this case without prejudice and remand to the USPTO for further consideration.  There is another prior art reference, discussed *infra*, which discloses a high pressure treatment of raw oysters, and thus constitutes strong evidence that Innovatit's claims are unpatentable.  A remand would permit the Board to consider the Innovatit claims in light of that prior art reference, and courts have remanded patent claims in similar circumstances.

## BACKGROUND

### A.    The Procedures for Applying for and Obtaining a Patent

An inventor seeking a patent must file a patent application with the USPTO.  The application is, essentially, a draft patent.  Like a patent, it contains two primary parts:  (1) a "specification;" and (2) one or more "claims."  The specification must describe the invention, and how to make and use it, in sufficient detail to enable "any person skilled in the art [technology] to which [the invention] pertains" to make and use the invention.  35 U.S.C. § 112, first paragraph.  The claims, on the other hand, identify what the applicant regards as his invention; *i.e.*, the scope of legal protection the applicant believes his invention is entitled to receive.  35 U.S.C. § 112, second paragraph.  Each claim is a single sentence that contains a number of "limitations" directed to the various features of the subject matter claimed.  35 U.S.C.

§ 112; *Hyatt v. Dudas*, No. 03-0901, 2005 WL 5569663, at *2 (D.D.C. Sept. 30, 2005). Several claims in a single application may share many of the same limitations. *Id.*

When the application is received by the USPTO, it is given to a patent examiner for examination. The examiner determines whether each claim satisfies certain statutory patentability requirements. For example, the examiner will determine whether each claim is "novel," *i.e.*, new, and also whether it would have been "nonobvious" to a person of ordinary skill in the relevant art. 35 U.S.C. §§ 102, 103. Section 102 of the Patent Statute sets forth the types of evidence – *e.g.*, earlier-issued patents, articles published in relevant technical journals, etc. – that the examiner may properly rely upon in rejecting a claim as "anticipated" (not novel) or obvious. This evidence is referred to as "prior art." *See* 37 C.F.R. § 1.104(a)(1).

If the examiner believes that a claim does not comply with the statutory patentability requirements, the examiner will reject the claim and issue an "office action" setting forth the grounds for the rejection. 37 C.F.R. § 1.104(a). In response, the applicant may (i) amend the rejected claim to distinguish it over the prior art that the examiner relied upon; and/or (ii) argue against the rejection. 37 C.F.R. § 1.111. The examiner will eventually issue a "final office action" if the examiner and the applicant cannot agree on the patentability of one or more claims. Otherwise, the examiner will "allow" the pending claims, and the USPTO will issue a patent for the claimed invention.

An applicant may appeal a final office action to the Board. 35 U.S.C. § 134. The Board will either sustain or reverse the examiner's rejections. 35 U.S.C. § 134(a). If the Board sustains the examiner's rejections, the applicant may either appeal directly to the Court of Appeals for the Federal Circuit ("Federal Circuit") under 35 U.S.C. § 141, or, as in the present case, proceed

with an action in the District Court for the District of Columbia under 35 U.S.C. § 145.

### B.     Factual Background

#### 1.     The '704 Application

##### a.     The Invention as Described in the '704 Application

Ernest A. Voisin filed U.S. Patent application No. 09/949,704 ("the '704 application"),

entitled "A Process of Elimination of Bacteria in Shellfish, of Shucking Shellfish and an

Apparatus Therefor," on September 10, 2001.  R3-30.  The '704 application is a continuation of

U.S. Application No. 09/524,444, which in turn is a divisional of U.S. Application No.

09/121,725 ("the '725 application"), filed on July 25, 1998.[1]  *Id.*  In its Complaint, plaintiff

alleges that it is the assignee of the entire right, title, and interest in the invention disclosed and

claimed in the '704 application.  Complaint, ¶ 3.

The specification of the '704 application discloses a process for eliminating harmful

bacteria in shellfish, such as oysters, by exposing the shellfish to high pressure for a limited

period of time, without applying heat.  R11.  The specification notes that bacteria from the

*Vibrio* genus, such as *Vibrio vulnificus*, which are found in warm coastal waters around the U.S.,

are of particular concern.  R4.  Eating raw oysters infected by the *Vibrio vulnificus* bacteria may

cause food poisoning that, in rare cases, is fatal.  R5.  According to the specification, the claimed

---

[1]  The '725 application is the subject of a related district court action, *Innovatit Seafood Systems, LLC v. Dudas*, Civ. No. 06-822.  Innovatit has already received four patents based at least in part on the '725 application:  (1) U.S. Patent No. 6,217,435, which claims a method of shucking raw oysters using high pressure; (2) U.S. Patent No. 6,426,103, which claims a method of destroying harmful bacteria in raw shellfish by exposing the shellfish to high pressure at above ambient temperatures; (3) U.S. Patent No. 6,537,601, which claims a method of destroying harmful bacteria in raw shellfish using high pressure and the application of heat; and (4) U.S. Patent No. 6,393,977, which claims an apparatus for processing raw food using high pressure.

high pressure process kills the bacteria on the surface of or harbored within the shellfish, without destroying the "sensory qualities" of raw shellfish.  R12.

The specification also teaches that treating raw shellfish with high pressure assists in "shucking" the shellfish, *i.e.*, opening the shells of the shellfish.  R14.  The specification notes that oysters treated with high pressure are much easier to shuck because the high pressure causes the adductor muscles that hold the two shell halves together to disengage from the shells, allowing the shells to be easily opened by hand.  *Id.*

### b.    Claims at Issue

After two "preliminary amendments" (amendments prior to the examiner's first office action), Innovatit presented a total of 12 claims for examination:  claims 5 and 27-38.  All of these pending claims are written in the form of a "product-by-process" claim.  Claim 5 recites a raw, "pressure-shucked" shellfish that is free from harmful bacteria:

> A post-pressurized raw shellfish that is pressure-shucked and free
> from pathogenic naturally-occurring marine bacteria and which has
> undergone treatment by exposing said raw shellfish to pressure of
> about between 20,000 p.s.i. and 50,000 p.s.i., said raw shellfish
> retaining sensory characteristics of raw product.

R169.  Claims 27-35 and 38 claim various other aspects of a raw, "pressure-shucked" shellfish. Some of these claims specify the time during which the shellfish are to be pressurized, *i.e.*, between 1 and 15 minutes,  the type of shellfish to be treated (*e.g.* oysters), the use of "flexible bands" around the shellfish during treatment, and the specific bacteria to be eliminated from the shellfish.  R169-70.

The examiner rejected claims 5 and 27-38 in an Office Action dated February 22, 2002. The examiner explained that the pending claims were anticipated by an earlier-issued patent,

U.S. Patent No. 5,773,064 issued to John Tesvich *et al.* ("the Tesvich '064 patent" or "Tesvich

'064").  The examiner stated:

> Tesvich et al teach a raw shellfish product free of pathogenic
> bacteria (column 2, line 66 to column 3, line 4), the shellfish being
> an oyster (column 3, line 12), a flexible band (Figure 2, 52), the
> bacteria including Vibrio Vulnificus (column 1, line 12), the
> shellfish being at a refrigerate [*sic*] temperature (column 6, lines 8-
> 14), and the shellfish being shucked (column 3, lines 5-9).

R54.  The examiner also recognized that the pending claims were specifically drawn to products,

and thus could be anticipated by any product having the same characteristics of the claimed

product, regardless of whether the prior-art product was produced in the same manner as the

claimed product:

> Phrases such as "by exposing said raw shellfish to pressure . . ."
> are merely preferred methods of making the claimed product and
> as such are not given patentable weight.

*Id.*  The examiner renewed his rejection of the claims in a final office action dated July 16, 2002.

R71-2.  Innovatit appealed this final rejection to the Board.  R115.

## 2.    The Prior Art of Record:  The Tesvich '064 Patent

The Tesvich '064 patent discloses a method of destroying *Vibrio vulnificus* bacteria on

molluscan shellfish, while leaving the shellfish meat in a raw state.  R56-A - H.  This method

uses "mild heat treatment" followed by rapid cool-down and cold storage.  R56-E, col. 2, lines

31-36; R56-G, col. 5, line 57 - col. 6, line 7.  The mollusks have a band placed around the shells

to keep them closed during treatment; the mollusks are then placed in a circulating bath of warm

water having a temperature of between about 110 °F and 140 °F.  R56-G, col. 5, lines 14-18, 42-

47.  The shellfish remain in the warm water bath for between about 10 to 120 minutes,

depending on the size of the mollusks being treated and the temperature of the warm water bath.

*Id.*, col. 5, lines 44-47.  The treatment duration and temperature are selected so as to not cook the

shellfish.  *Id.*, col. 5, lines 50-52.  Finally, the mollusks are removed from the water bath, quickly

cooled in a cold-fluid bath, and refrigerated until consumed, at which point the bands are

removed and the shellfish are shucked.  *Id.*, col. 5, line 57 - col. 6, line 11.  When consumed, the

mollusks retain their "natural flavor and raw texture."  *Id.*, col. 3, lines 5-9, col. 6, lines 15-18.

     **3.**       **Innovatit's Appeal to the Board**

     On appeal to the Board, Innovatit argued that all pending product-by-process claims were

patentable over the Tesvich '064 reference.  Acknowledging that the patentability of a product-

by-process claim is based on whether the product itself is patentable, Innovatit argued to the

Board that "the end product of the claimed invention and the end product of the Tesvich '064

reference are different."  R162.  Innovatit specifically argued that, unlike the claimed product,

the end product of the Tesvich process is (1) not bacteria free; (2) not raw; and (3) not shucked.

In support, Innovatit cited the following evidence:

     (i)       U.S. Patent No. 5,976,601 to Tesvich *et al.* ("the Tesvich '601 patent" or

"Tesvich '601").  R182-88.  The Tesvich '601 patent discloses a refinement of the mild-heat-

treatment process disclosed in the Tesvich '064 patent, specifically for oysters.  The major

refinement is the teaching that the water temperature and heat-treatment duration are chosen to

ensure that the internal oyster-meat temperature is brought to between 49 $^\circ$C and 53 $^\circ$C (120 $^\circ$F -

127.4 $^\circ$F).  R185, col. 1, lines 52-56.  Innovatit alleged that the Tesvich '601 patent calls into

question the disclosure of the Tesvich '064 patent because it teaches that the internal oyster meat

temperature must be maintained within this 4 $^\circ$ C window for the mild heat treatment process to

"work."  R166.

(ii)      A Letter from Dr. Marilyn B. Kilgen, Professor and Head of the Department of Biological Sciences of Nicholls State University ("Kilgen Letter").  R171-72.  Dr. Kilgen "explain[s] the difference in protein denaturation in raw oysters using heat versus using hydrostatic high pressure."  R171.

(iii)      A letter from Drs. Bell and Bankston, Professors in the Department of Food Science, Louisiana State University ("Bell-Bankston Letter").  R173-74.  In their letter, Drs. Bell and Bankston allege that the final product oyster resulting from the high-pressure "Motivatit" process is different from that resulting from the thermal "Ameripure" process.  R173.

(iv)      Studies performed by Dr. Jimmy Xu, Professor in the Department of Food Science at  Louisiana State University ("Xu Studies").  R173-4.  Dr. Xu tested different oysters for fatty acid composition and his results showed that the fatty acid profile of "Motivatit's" oyster is different from both raw untreated oysters and "Ameripure's" oyster.  R174.

(v)      The declarations of Christopher Lee Nelson and Alfred R. Sunseri ("The Nelson and Sunseri Declarations").  R175-181.  The Nelson and Sunseri Declarations are identical except for introductory paragraphs that set forth each declarant's  educational background and experience with oysters.  *Id.*  The Nelson and Sunseri Declarations state that the Tesvich process is "difficult to control because of the lack of uniformity of the oysters being processed."  R176, R179.  They also reiterate that oysters treated by the Tesvich process must be mechanically shucked by hand with a knife, and allege that such oysters are thus "inconsistent in taste and appearance."  R176-A, R180.

### 4.      The Board Decision

The Board affirmed the examiner's rejection.  The Board considered claim 5 to be

representative of the appealed claims, and characterized the product of claim 5 as (1) post-pressurized and pressure-shucked; (2) free from pathogenic naturally occurring marine bacteria; and (3) retaining the sensory characteristics of a raw oyster.  R236.  The Board found that the Tesvich '064 patent discloses a raw shellfish product that is (1) shucked; (2) free from harmful pathogenic bacteria; and (3) raw, *i.e.*, that retains its natural flavor and raw texture.  *Id.*  The Board further held that "the Patent Office bears a lesser burden of proof making out a case of prima facie unpatentability for product-by-process claims because of their peculiar nature than would be the case when a product is claimed in the more conventional fashion."  R235.

The Board found unpersuasive Innovatit's reliance on the Tesvich '601 patent to show that shellfish produced by the process of the Tesvich '064 patent are not bacteria-free and are cooked.  The Board pointed out that Tesvich '064 repeatedly teaches that the shellfish product should be in a raw, uncooked state.  R237 (citing R56-F, col. 3, lines 61-65; R56-G, col. 5, lines 50-52).  The Board also noted that the Tesvich process reduced the bacteria on treated oysters to an undetectable level.  *Id.* (citing R56-E-F, col. 2, lines 44-46; col. 2, line 66 - col. 3, line 4).

The Board then considered the remaining evidence submitted by Innovatit and found it equally unpersuasive.  R239.  Specifically, the Board found that the Kilgen Letter and the Bell-Bankston Letter addressed heat and pressure treatments in general and did not specifically address either the claimed invention or the process of the Tesvich '064 patent.  R239-40.  It also observed that the Bell-Bankston Letter admitted that both the Motivatit process and Ameripure process result in a shellfish that is "*vibrio* free."  R240.  It likewise found that the Xu Studies and the Nelson and Sunseri Declarations failed to explain the process used to produce the oysters tested.  R240-41.  The Board found that the statements in the Nelson and Sunseri Declarations

about the Tesvich process being "very difficult" to control were counter to the teachings of the

Tesvich '064 patent, since the Tesvich '064 patent taught sorting the oysters by size prior to

treatment.  R241.

Finally, the Board opined that the examiner should consider the patentability of claimed

subject matter in view of Japanese Patent No. 4,356,156 to Miura Yasushi et al. ("JP '156" or

"Yasushi") in the event of further prosecution in the '704 application.[2]  R242-3.  JP '156 teaches

a method of shucking raw shellfish, such as oysters, by exposing them to pressures of between

about 1000 and 4000 "atmospheres" (14,200 p.s.i. to 58,000 p.s.i.) for a period of about 0.5

minutes and 10 minutes.  Exh. A at 1147.  The oysters are thereby rendered easy to open but still

raw.  R1150.

## STANDARD OF REVIEW

### A.    Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c); *Fund for Animals v. Williams*, 246 F. Supp. 2d. 27, 33

(D.D.C. 2003); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party moving

for summary judgment has the burden of showing that there is no genuine issue of material fact.

*Celotex*, 477 U.S. at 323.  Upon that showing, the nonmoving party must present evidence

showing the existence of a genuine issue of material fact.  *See Matsushita Elec. Indus. Co. v.*

---

[2]  A translated copy of JP '156 is attached as Exhibit A.  It is also included in the
administrative record filed in *Innovatit Seafood Systems, LLC v. Dudas*, No. 06-822, at R1142-
51.

*Zenith Radio* Corp., 475 U.S. 574, 586 (1986). Mere denials or conclusory statement are

insufficient to create a genuine issue of material fact. *See, e.g.*, *Burke v. Gould*, 286 F.3d 513,

517-20 (D.C. Cir. 2002); *Hayes v. Shalala*, 902 F. Supp. 259, 263 (1995); *Barmag Barmer*

*Maschinefabrik AG v. Murata Mach.*, 731 F.2d 831, 836 (Fed. Cir. 1984). Similarly, if the

nonmoving party's evidence is not significantly probative, summary judgment can be granted.

*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). If the record taken as a whole

could not lead the Court to find for the nonmoving party, there is no genuine issue for trial. *See*

*Matsushita Elec. Indus. Co.,* 475 U.S. at 587.

### B.    Review of Actions Brought Pursuant to 35 U.S.C. § 145

Although most patent applicants dissatisfied with a Board decision typically appeal that

decision directly to the Federal Circuit, Innovatit brings the present action to this Court under 35

U.S.C. § 145. It is still, however, an appeal of an agency action in accordance with the

Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* *See Mazzari v. Rogan*, 323 F.3d

1000, 1004 (Fed. Cir. 2003) (holding that the USPTO is an agency subject to the APA, and

therefore "a reviewing court must apply the APA's court/agency review standards"").

Accordingly, the Court may set aside legal actions of the Board that are "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law," and may set aside factual findings

only when they are "unsupported by substantial evidence." 5 U.S.C. § 706 (2000); *Mazzari*, 323

F.3d at 1005; *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000). If the parties present

additional evidence to the Court, which on a review under Section 145 may be done only in

limited circumstances, the court must make "*de novo* factual findings if the evidence is

conflicting." *Mazzar*i, 323 F.3d at 1004; *see also Gould v. Quigg*, 822 F.2d 1074, 1077 (Fed.

Cir. 1987); *Hyatt v. Dudas,* 393 F. Supp. 2d. 1, 6 (D.D.C. 2005). Plaintiff bears the burden of

showing that the Board committed reversible error. *Fregeau v. Mossinghof*, 776 F.2d 1034,

1038 (Fed. Cir. 1985).

## ARGUMENT

I.  **SUBSTANTIAL EVIDENCE SUPPORTED THE EXAMINER'S FINDING THAT PRIOR PATENTS ANTICIPATED THE PRODUCT PLAINTIFF SOUGHT TO PATENT PURSUANT TO 35 USC § 102(e) AND PRECLUDED THE GRANT OF PLAINTIFF'S PATENT APPLICATION FOR THAT PRODUCT.**

Under 35 U.S.C. § 102(e), "[a] person shall be entitled to a patent unless–the invention

was described in . . . a patent granted on an application for patent by another filed in the United

States before the invention by the applicant for patent." There is no dispute that the Tesvich

'064 patent was granted on an application filed before the effective filing date of the '704

application. Moreover, the Board's conclusion that the Tesvich '064 patent describes the exact

shellfish claimed by Innovatit in the "product-by-process" claims at issue was supported by

substantial evidence and correct.

A product-by-process claim is "one in which the product is defined at least in part in

terms of the method or process by which it is made." *SmithKline Beecham Corp. v. Apotex

Corp.*, 439 F.3d 1312, 1315 (Fed. Cir. 2006). "[S]uch claims are always to a *product*, not a

process. . . . One cannot avoid anticipation by an earlier product disclosure by claiming the

product as produced by a particular process." *Id.* at 1317. In other words, if a prior art reference

discloses the claimed product, even if it is made by a process different than that claimed, the

prior art nevertheless anticipates the claimed product.

This was precisely the case in *In re Thorpe*, 777 F.2d 695 (Fed. Cir. 1985). There, the

12

patent claimed a composition that was used in carbonless copy paper systems. *Id.* at 696. The composition was known in the prior art, but was previously made using zinc dibenzoate. In a product-by-process claim, the patentee claimed the same composition made by a process that used zinc oxide and benzoic acid, rather than zinc dibenzoate. The Federal Circuit affirmed the USPTO's rejection of the claim. *Id.* at 698. The Court held that "[i]f the product in a product-by-process claim is the same as or obvious from a product of the prior art, the claim is unpatentable even though the prior product was made by a different process." *Id.* at 697; *see also SmithKline Beecham*, 439 F.3d at 1315 (holding that "once a product is fully disclosed in the art, future claims to that same product are precluded, even if that product is claimed as made by a new process").[3]

In the present case, as will be demonstrated below, the product defined by the pending product-by-process claims – a raw, shucked shellfish free from pathogenic bacteria – is not new, but was disclosed several years before in the Tesvich '064 patent, as found by the Board. Accordingly, Tesvich '064 anticipates the pending claims.

### A.    The Pending Claims Cover a Raw, Shucked Mollusk That Is Free from Pathogenic Bacteria

The '704 application contains four independent claims, all drawn generally to a shellfish that is raw, "pressure-shucked," and free from harmful bacteria. For example, representative[4]

---

[3]  If the process for making the product is truly new, the process itself may be patentable. *Smithkline*, 439 F.3d at 1319. In the present case, however, the high-pressure process is not new. *See* Def. Mot. for Summ. J. filed in *Innovatit, Inc. v. Dudas*, Civ. No. 06-0822.

[4]  Innovatit argued in its brief to the Board that it believed every claim at issue was "separately patentable." R159-60. However, as the Board found, Innovatit merely recited the limitations of each claim and stated that the "cited prior art fails to disclose" these limitations. *Id.*; *see* R233. The Board thus correctly found that Innovatit did not comply with 37 CFR §

claim 5 recites:

> A post-pressurized raw shellfish that is pressure-shucked and free
> from pathogenic naturally-occurring marine bacteria and which has
> undergone treatment by exposing said raw shellfish to pressure of
> about between 20,000 p.s.i. and 50,000 p.s.i., said raw shellfish
> retaining sensory characteristics of raw product.

R169.  Other claims further specify the time (between one and 15 minutes) during which the

shellfish are to be pressurized; the type of shellfish to be treated (*e.g.*, oysters); the use of

flexible bands around the shellfish during treatment; and the specific bacteria to be eliminated

(*e.g.*, *Vibrio vulnificus*).  R169-70.    Thus, the "product" that is claimed here is a (i) shellfish

(*i.e.*, mollusk, such as oyster or clam); that is (ii) raw ("retaining sensory characteristics of raw

product"); (iii) free from harmful marine bacteria such as *Vibrio vulnificus*; and (iv) shucked

(*i.e.*, the shell is open).

The term "post-pressurized" as used in representative claim 5, and the related process

limitations in that claim (directed to the exposure of the shellfish to a specific high pressure

range for a specific period of time), do not describe a physical or structural characteristic of the

claimed shellfish. Indeed, the purpose and object of the disclosed pressurization process is to

avoid changing the physical characteristics of the raw shellfish.  R11 ("It is another object of the

present invention to provide a method of reducing harmful bacteria in raw shellfish without

substantially affecting its sensory qualities").  Thus, one of ordinary skill in the art would not be

able to tell the difference between a raw oyster that has been pressurized according to the

disclosed process, and one that has not (other than in terms of the absence of pathogenic bacteria,

---

1.192(c)(7) (now 37 C.F.R. § 41.37(c)(1)(vii)), concluded that the claims stand or fall together,
and selected claim 5 as the representative claim upon which to decide the appeal.  R233.

a characteristic that is recited as a separate limitation).  Therefore, the "post-pressurized" term does not confer patentability on the claimed product.  *See SmithKline Beecham*, 439 F.3d at 1319 (SmithKline's product by process patent claiming paroxetine made by an allegedly novel process is anticipated by its earlier product patent for paroxetine).

Similarly, the term "pressure-shucked" as used in representative claim 5 does not impart physical characteristics to the claimed product.  Rather, it refers to the method by which the shell of the mollusk is opened to expose the meat of the shellfish.  But whether shucking is performed by pressure or mechanically, the end result is the same:  a shucked oyster.

### B.    Tesvich '064 Discloses a Raw, Shucked Mollusk That Is Free from Pathogenic Bacteria

The Board found "that the product of Tesvich '064 reasonably appears to be identical to the product recited in claim 5 on appeal."  R236.  The Board specifically found that Tesvich '064 discloses a shellfish that is (i) raw, *i.e.*, that retains the sensory characteristics of raw product; (ii) free from pathogenic naturally-occurring marine bacteria; and (iii) shucked.  Substantial evidence supports these findings.

Tesvich '064 discloses a process for treating unshucked raw molluscan shellfish to destroy harmful bacteria on the shellfish while leaving the shellfish meat in a raw state.  R56-E, col. 2, lines 32-36, 66-67.  The shellfish are separated into grades according to size, and banded to prevent the shell from opening during processing.  The shellfish then undergo "mild heat treatment," preferably by immersion in a circulating bath of water heated to about 110-140 ° F (43.3-60 ° C).  R56-G, col. 5, lines 37-44.  The mild heat treatment may last between 10 and 120 minutes, depending on the grade size of the shellfish and the temperature of the warm fluid bath.  *Id.*, col. 5, lines 44-47.  Tesvich '064 cautions that "[t]he temperature of the fluid bath and

15

immersion time period is selected as to not cook the mollusk." *Id.*, col. 5, lines 50-52.  Next, the shellfish are cooled, preferably in a continuously flowing cold fluid bath that is between about 28-36 ° F, for about 15-20 minutes, depending on the grade of the product.  *Id.*, col. 5, lines; col. 6, lines 3-6.  The shellfish are then refrigerated until consumed, at which point the bands are removed and the shellfish are shucked.  R56-F, col. 3, lines 5-7; R56-G, col. 6, lines 8-12; R56-H, col. 8, lines 14-18.

Thus, the product of the process disclosed in Tesvich '064 is the same as the product Innovatit sought to patent in claim 5.  Tesvich '064 discloses a shellfish that is raw, because Tesvich '064 teaches grading the shellfish and selecting the mild-heat-treatment temperature and duration that is appropriate for each grade to avoid cooking the shellfish.  Tesvich '064 also expressly discloses a shellfish that is free from harmful marine bacteria, such as *Vibrio*.  R56-F, col. 3, lines 45-50; R56G, col. 6, lines 32-35.  Finally, Tesvich '064 expressly discloses that the shellfish are shucked.  *See* R56F, col. 3, lines 5-7 ("To serve the mollusk one removes the band and removes the shell per the known 'raw bar' style mollusk preparation method"); R56H, col. 8, lines 16-18 (claiming "shucking" of the raw shellfish after processing and before consumption).  Accordingly, substantial evidence supports the Board's finding that representative claim 5 is anticipated by Tesvich '064 and not patentable under 35 U.S.C. § 102(e).

**C.    Innovatit Has Not Provided Persuasive Evidence That the Tesvich '064 Shellfish Differs From the Claimed Shellfish**

Innovatit argued to the Board that Tesvich '064 does not disclose a raw, bacteria-free product, since the same inventors, Tesvich *et al.*, acknowledged in a subsequent patent (Tesvich '601) that oyster meat will start to cook if it reaches 53° C (127.4° F), and that the water bath must be between 49° C (120.2 ° F) and 55° C (131° F) to kill *V. vulnificus* bacteria.  R237.  The

Board correctly rejected this argument.  As the Board noted, Tesvich '064 repeatedly teaches

that the temperature and duration parameters of the process are to be chosen so that the

pathogenic bacteria on the shellfish are reduced to an undetectable level, *and* so that the shellfish

remain raw following treatment.  *See, e.g.*, R56-F, col. 3, lines 61-65; R56-G, col. 5, lines 52-62.

A person of ordinary skill in the art would require only routine experimentation to optimize the

parameters to achieve this result.  *See In re Kulling*, 897 F.2d 1147, 1149 (Fed. Cir. 1990)

(affirming Board decision that claimed amount of "eluent" to be used in washing sequence was a

"matter of routine optimization in the pertinent art"); *In re Peterson*, 315 F.3d 1325, 1330 (Fed.

Cir. 2003) ("discovery of an optimum value of a result effective variable in a known process is

ordinarily within the skill of the art").

     Innovatit next argues that it has submitted evidence that shows that the end product of its

process differs from that of Tesvich '064.  Innovatit specifically cites to the Kilgen Letter, the

Bell/Bankston Letter, the Xu Studies, and the Nelson/Sunseri Declarations, and claims that these

items show that "the cited reference . . . does not disclose a 'raw shellfish' product because the

product becomes cooked, and does not disclose 'shucked' product because the product requires

manual shucking in a conventional manner after heat processing."  R162.  The Board correctly

found that none of these items was persuasive.

     As to the Kilgen Letter, the Board correctly noted that it refers to "thermal or heat

processing," and "high pressure processing" in general, and does not specifically compare the

product resulting from the Tesvich '064 process with the claimed product.  *See* R171.  This is

particularly significant because the findings of the Kilgen Letter depend on "the level of heat,"

suggesting, as does Tesvich '064, that as long as the heat is kept below a certain level, the

shellfish is not cooked.  Thus, the Kilgen Letter does not constitute probative evidence that the Tesvich '064 product differs from the product resulting from the claimed process.  *See In re de Blauwe*, 736 F.2d 699, 705 (Fed. Cir. 1984) (when using comparative test data to show that its product differs from that of the prior art, an applicant must compare his claimed invention to the "closest prior art"); *In re Woodruff*, 919 F.2d 1575, 1578 (Fed. Cir. 1990) (applicant's comparison of his invention with commercial embodiment of prior art invention was not probative, because it was not a comparison with the actual method taught in the prior art patent).

Similarly, the Bell-Bankston Letter fails to show a difference between the claimed product and the Tesvich '064 product.  As the Board noted, it only refers generically to oysters produced by the "Motivatit" and "Ameripure" processes, but does not specifically identify those processes as corresponding to the claimed process or the Tesvich process.  Moreover, even if we were to assume that the Bell-Bankston letter discusses the processes at issue here, it actually lends support to the notion that the products resulting therefrom are substantially the same.  Specifically, the Bell-Bankston letter admits that the final product oyster from Motivatit and Ameripure are both "*vibrio* free" and only differ in physical condition "depending on the application of the shucking knife."  R240.

The Nelson-Sunseri declarations and the Xu Studies are equally unconvincing.[5]  Again, neither the declarations nor the Xu Studies set forth the specific processes used to produce the oysters tested, and thus there is no showing that the results reflect a true comparison of the claimed oyster with the Tesvich '064 oyster.  *See de Blauwe*, *supra*; *Woodruff*, *supra*.  While the

---

[5]  The fact that these two declarations are virtually identical suggests that they were written by Innovatit counsel rather than by the declarants themselves.  For this reason, they should be given little weight.

declarations state that the oyster meat's outer membrane is "usually" cut during mechanical shucking, they do not specify if this was the case with the product actually tested. The declarations also state that the Tesvich '064 process is "very difficult" to control and results in "over cooking" the less dense oysters. R176. In this regard, the declarations seem to assume that the Tesvich '064 process involves batches of oysters containing oysters of varying sizes and densities. *Id.* This assumption is incorrect, since Tesvich '064 teaches separating the oysters by size prior to treatment. R56-G, col. 5, lines 11-13. Tesvich '064 thus teaches that the process is controlled by temperature, duration, *and oyster size* to destroy harmful bacteria while keeping the meat raw.

## II.    IN THE ALTERNATIVE, THIS CASE SHOULD BE REMANDED SO THAT THE USPTO MAY CONSIDER WHETHER PLAINTIFF'S CLAIMS ALSO ARE ANTICIPATED BY JP '156

If the Court determines that substantial evidence does not support the Board's conclusion that Plaintiff's claims were anticipated by the Tesvich '064 patent, the Court should remand this case to the USPTO so that the USPTO may consider whether JP '156 anticipates the pending claims. Courts have often remanded Section 145 actions to permit the USPTO to examine claims in light of prior art not previously considered. Such remands allow the court to "benefit from the Patent Office's technical expertise in assessing the art." *ExxonMobil Chem Patents Inc. v. Godici*, 2002 WL 34233002, at *3 (D.D.C. Feb. 12, 2002) (citing other D.D.C. cases that were remanded to the USPTO for further examination after discovery of additional prior art). Further, the Board itself observed that it would be appropriate to examine the '704 application in light of JP '156. R242-3.

There can be no serious dispute that an oyster produced by the method disclosed in

JP'156 is identical to the claimed oyster. First, since JP'156 discloses a process that uses pressure to shuck oysters, it is clear that JP'156 produces an oyster that is "post-pressurized," and "pressure-shucked." *See* Exh. A at 3. JP'156 also discloses an oyster that has been exposed to pressure of about 20,000 psi to 50,000 psi. Specifically, JP'156 discloses pressurizing oysters at 3000 atmospheres (44,100 psi) for three minutes. *Id.* at 5. This is squarely within the time and pressure ranges set forth in claims 27-35 and 38.

While JP'156 does not expressly disclose that its process produces an oyster that is free from harmful bacteria, this is an inherent result of the disclosed process. *See Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1347 (Fed. Cir. 1999) ("Under the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claimed limitations, it anticipates." (internal citation omitted)). That the disclosed process of JP'156 would produce a *Vibrio* free oyster is evident from the fact that the process is conducted within the time and pressure parameters of Innovatit's claims, which Innovatit must admit is sufficient to disinfect oysters. Thus, JP'156 anticipates the pending claims of the '704 application.

## **CONCLUSION**

Because substantial evidence supports the Board's finding that Tesvich '064 anticipates the pending claims in the '704 application, Defendant respectfully requests that this Court enter an order granting summary judgment in its favor and dismissing the Complaint with prejudice or, alternatively, remanding the case to the USPTO for consideration of the patentability of the pending claims in light of JP '156.

Respectfully submitted,

_____/s/_____

JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney

_____/s/_____

RUDOLPH  CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

_____/s/ Robin M. Meriweather_____

ROBIN M. MERIWEATHER, D.C. Bar # 490114
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202/514-7198
202/514-8780 (facsimile)

Of Counsel:

STEPHEN WALSH
Acting Solicitor

BENJAMIN D. M. WOOD
JANET GONGOLA
Associate Solicitors
United States Patent and Trademark Office

November 2, 2007

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **INNOVATIT SEAFOOD SYSTEMS, LLC.,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Civil Action No. 06-0825 (JR)** |
| | ) | |
| **DIRECTOR, UNITED STATES PATENT AND TRADEMARK OFFICE,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**ORDER [PROPOSED]**

Upon consideration of defendant's motion for summary judgment, plaintiff's response

thereto, and the entire record in this matter, it is hereby

ORDERED that defendant's motion for summary judgment is GRANTED; and it is

FURTHER ORDERED that plaintiff's complaint is DISMISSED WITH PREJUDICE.

_____
United States District Judge

**Date:**