**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| INNOVATIT SEAFOOD SYSTEMS, LLC. *et al.,*  )  )  )  Plaintiffs,  )  )  v.  )  )  DIRECTOR, UNITED STATES PATENT AND TRADEMARK OFFICE,  )  )  )  )  Defendant.  )  _____ ) | Civil Action No. 06-0825 (JR) |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant, the Director of

the  United States Patent and Trademark Office ("USPTO or "Defendant"), respectfully submits

this opposition to the motion of Plaintiffs Innovatit Seafood Systems, LLC ("Innovatit") and

Avure Technologies, Inc. ("Avure") (collectively "Plaintiffs") for summary judgment.  Plaintiffs

brought the present action under 35 U.S.C. § 145 challenging the decision of the USPTO's

Board of Patent Appeals and Interferences ("Board"), which affirmed the rejection of claims 5

and 38 of Innovatit's U.S. Patent Application Serial No. 09/949,704 ("the '704 application") as

unpatentable under 35 U.S.C. § 102(e).

As set forth in the attached Memorandum of Points and Authorities in opposition to

Plaintiffs' motion, as well as Defendant's Memorandum of Points and Authorities in support of

its own motion for summary judgment, there are no material facts in genuine dispute as to the

unpatentability of the '704 application under 35 U.S.C. § 102(e).  Further, Defendant is entitled

to judgment as a matter of law.  Therefore, Defendant respectfully requests that this Court grant

Defendant's motion for summary judgment, and deny Plaintiffs' cross- motion for summary

judgment.

Alternatively, Defendant respectfully requests that the matter be remanded to the USPTO

for consideration of an additional prior art reference, not yet considered by the Board, that

strongly supports a determination of unpatentability of the pending claims under 35 U.S.C.

§§ 102 and 103.

Dated: November 30, 2007             Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_____/s/_____
RUDOLPH  CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


_____/s/ Robin M. Meriweather_____
ROBIN M. MERIWEATHER, D.C. Bar # 490114
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
(202) 514-7198          Facsimile: (202) 514-7198
Robin.Meriweather2@usdoj.gov

Of Counsel:

STEPHEN WALSH
Acting Solicitor

BENJAMIN D. M. WOOD
JANET GONGOLA
Associate Solicitors
United States Patent and Trademark Office

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| INNOVATIT SEAFOOD SYSTEMS, LLC., *et al*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 06-0825 (JR) |
| DIRECTOR, UNITED STATES PATENT AND TRADEMARK OFFICE, | ) ) ) ) | |
| Defendant. | ) ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTESTED FACTS IN SUPPORT OF INNOVATIT SEAFOOD SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO LOCAL RULE 7(h)**

Pursuant to Local Civil Rule 7(h), Defendant responds to Plaintiffs' statement of facts that Plaintiffs allege are uncontested.

1-17.   Agree.

18.   The USPTO generally agrees with Plaintiffs' characterization of the Tesvich process, except that Plaintiffs omitted the step of grading the oysters to be treated into categories according to size.  *See* 56-C, Fig. 1; 56-E, col. 2, lines 38-40.  In addition, while Tesvich calls for shucking the oysters per the known "raw bar" style mollusk preparation method, it does not call for cutting the adductor muscle.

19.   While the USPTO agrees that Tesvich '064 does not teach pressurizing shellfish, the product resulting from the Tesvich '064 product is the same as that resulting from the claimed process, *i.e.*, a raw, shucked oyster free from harmful bacteria.

20. While the USPTO agrees that Tesvich '064 does not teach pressurizing shellfish, the USPTO notes that Tesvich does teach shucking of the treated oysters prior to consumption.

21. Disagree. *See, e.g.*, R56-E, col. 2, line 66 - R56-F, col. 3, line 1 ("The pathogenic bacteria may be reduced to an undetectable level by this process."); *see also* R56-G, col. 6, lines 33-36 ("By employing the aforementioned process, one reduces or even destroys the harmful bacteria.").

22. Disagree. *See, e.g.*, R56-G, col. 6, lines 33-36 ("By employing the aforementioned process, one reduces or even destroys the harmful bacteria, yet leaves the mollusk in a raw state, still in the shell, which is viable for commercial consumption.").

23-24. Agree.

25. This is not a statement of fact to which a response is required. In any event, it constitutes a mischaracterization of MPEP 2113.

26. Disagree. While Dr. Kilgen discussed the effects of the "protein denaturation mechanism of thermal or heat processing" in general, which she acknowledged depended on the level of heat, she did not discuss the specific effects of the Tesvich '064 mild heat treatment process. R171.

27. The USPTO disagrees that Drs. Bell's and Bankston's reference to the "Ameripure" oyster refers to an oyster prepared according to Tesvich '064. The USPTO agrees that manual shucking is required following the Tesvich '064 mild heat-treatment process and prior to consumption, as disclosed in Tesvich '064.

4

28. Disagree.  The USPTO disagrees that the reference in the Bell-Bankston letter to the "Motivatit" oyster refers to an oyster prepared according to the claims at issue, and disagrees that the reference to the "Ameripure" oyster refers to an oyster prepared in accordance with Tesvich '064.   With respect to Dr. Xu's studies, which are reported in the Bell-Bankston letter (R173-74) and the September 12, 2003 letter of Dr. Bell (R209-10), there is no indication in either of those letters as to the precise parameters at which the oysters were tested (*e.g.*, how many oysters were tested, how long the heat-treated oysters were treated, at what specific temperature, whether or not they were separated into different grades based on size as taught by Tesvich '064, etc.).

29. The USPTO agrees that Mr. Nelson stated in his declaration that "[t]he Tesvich oyster is inconsistent in taste and appearance because it is partially cooked and shucked by hand with a knife."  Mr. Nelson did not indicate how many "Tesvich" oysters he sampled in order to reach this conclusion.

30. Disagree.  Mr. Sunseri did not testify that he tested "several oysters" produced by the Tesvich process or by the claimed process, or that he tested oysters from different "batches," as Defendant implies.  While Mr. Sunseri stated that the Voisin oyster "is perfectly shucked during the process," he did not state that such perfect shucking occurred "every time, and with every batch."  *See generally* R178-81.

31-32. Disagree.  These statements do not appear in the Sunseri declaration which appears as Exhibit D to Plaintiffs' Memorandum and in the administrative record

at R178-81.

33.    Agree, but Defendant The USPTO agrees with the fact set forth in paragraph 33, but avers that the USPTO is not required pursuant to case law to produce any affidavit from a person skilled in the art regarding the anticipation of the claims in dispute.  *See, e.g., In re Huang*, 100 F.3d 135, 139 (Fed. Cir. 1996) ("In the *ex parte* process of examining a patent application, the PTO lacks the means or resources to gather evidence which supports or refutes the applicant's assertion that the sales constitute commercial success.").

Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_____/s/_____
RUDOLPH  CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


_____/s/ Robin M. Meriweather_____
ROBIN M. MERIWEATHER, D.C. Bar # 490114
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
(202) 514-7198       Facsimile: (202) 514-8780

Of Counsel:

STEPHEN WALSH
Acting Solicitor

BENJAMIN D. M. WOOD
JANET GONGOLA

Associate Solicitors
United States Patent and Trademark Office

November 30, 2007

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| INNOVATIT SEAFOOD SYSTEMS, LLC., *et al.*, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 06-0825 (JR) |
| | ) | |
| DIRECTOR, UNITED STATES PATENT AND TRADEMARK OFFICE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Atlantic Thermoplastics Co., Inc. v. Faytex Corp.*, 970 F.2d 834 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 9

*Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . 18

*In re Dance*, 160 F.3d 1339 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re de Blauwe*, 736 F.2d 699 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16

*ExxonMobil Chemical Patents Inc. v. Godici*, 2002 WL 34233002 (D.D.C. Feb. 12, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Gartside,* 203 F.3d 1305 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In re Kulling*, 897 F.2d 1147 (Fed. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Peterson*, 315 F.3d 1325 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312 (Fed. Cir. 2006) . . . . . . . . 8

*Transclean Corp. v. Bridgewood Serv., Inc.*, 290 F.3d 1364 (Fed. Cir. 2002) . . . . . . . . 9

*In re Woodruff*, 919 F.2d 1575 (Fed. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16

### DOCKETED CASES

*Innovatit Seafood Systems, LLC v. Dudas*, Civ. No. 06-822 . . . . . . . . . . . . . . . . . . . . . . . 2

### FEDERAL STATUTES

35 U.S.C. § 102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

35 U.S.C. § 102(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 9, 12

35 U.S.C. § 145 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    The '704 Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
        1.    The Invention as Described in the '704 Application . . . . . . . . . . . . . 1
        2.    Claims at Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    The Prior Art of Record:  The Tesvich '064 Patent . . . . . . . . . . . . . . . . . . . . 3
    C.    Innovatit's Appeal to the Board . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    D.    The Board Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    E.    Plaintiffs' Motion for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    I.    THE BOARD DID NOT ERR IN DETERMINING THE PATENTABILITY
        OF PLAINTIFFS' PRODUCT-BY-PROCESS CLAIMS BASED ON THE
        PRODUCT ITSELF AND NOT ON THE PROCESS BY WHICH IT IS
        PRODUCED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    II.    PLAINTIFFS' MOTION MUST FAIL BECAUSE THE BOARD'S
        DECISION FINDING THE CLAIMS OF THE '704 APPLICATION TO BE
        ANTICIPATED BY TESVICH '064 IS SUPPORTED BY SUBSTANTIAL
        EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        A.    The Pending Claims Cover a Raw, Shucked Mollusk That is Free
            from Pathogenic Bacteria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        B.    Tesvich Discloses a Raw, Shucked Mollusk That Is Free from
            Pathogenic Bacteria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    III.    THE EVIDENCE MARSHALED BY PLAINTIFFS IN THEIR MOTION IS
        INSUFFICIENT TO JUSTIFY REVERSING THE BOARD'S DECISION
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        A.    The Kilgen Letter Is Irrelevant Because it Does Not
            Compare the Tesvich '064 Product with the Claimed
            Product . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        B.    The Bell-Bankston Letter Is Irrelevant Because it Shows No
            Difference Between the Tesvich '064 Product and the Claimed
            Product . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**C.** **The Xu/Godber Studies Suffer from the Same Defect as the Bell-bankston Letter: They Do Not Establish That the Claimed Oyster Was Compared Against the Tesvich '064 Oyster** . . . . . . . . . . . . . . . 15

**D.** **The Nelson/Sunseri Declarations, Like Plaintiffs' Other Evidence, Does Not Make the Right Comparison Between the Claimed Oyster and the Tesvich '064 Oyster** . . . . . . . . . . . . . . . . . . 16

**E.** **The Tesvich '601 Patent Does Not Undermine Tesvich '064** . . . . . . . 17

**IV.** **PLAINTIFFS' CLAIMS ARE ALSO ANTICIPATED BY JP '156** . . . . . . . 18

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

iv

## INTRODUCTION

The Defendant, U.S. Patent and Trademark Office ("USPTO" or Defendant"),

respectfully submits this memorandum of points and authorities in opposition to the motion of

Plaintiffs Innovatit Seafood Systems, LLC ("Innovatit") and Avure Technologies, Inc. ("Avure")

(collectively "Plaintiffs") for summary judgment.  The Board of Patent Appeals and

Interferences ("Board") found that the claims at issue in this patent case are unpatentable under

35 U.S.C.

§ 102(e) because they are anticipated.  The Board's decision is supported by substantial

evidence, and summary judgment should therefore be entered for Defendant and against

Plaintiffs.

## STATEMENT OF FACTS

The background concerning patent applications and the facts concerning the application

at issue in this litigation are set forth in detail in Defendant's Motion for Summary Judgment.

*See* Dkt. Entry 25.  The following paragraphs address only those facts necessary to provide a

context for this opposition memorandum.

### A.     The '704 Application

#### 1.      The Invention as Described in the '704 Application

Ernest A. Voisin filed U.S. Patent application No. 09/949,704 ("the '704 application"),

entitled "A Process of Elimination of Bacteria in Shellfish, of Shucking Shellfish and an

Apparatus Therefor," on September 10, 2001.  R3-30.  The '704 application is a continuation of

U.S. Application No. 09/524,444, which in turn is a divisional of U.S. Application No.

09/121,725 ("the '725 application"), filed on July 25, 1998.[1]  *Id.*  In the original complaint, Innovatit alleged that it was the assignee of the entire right, title, and interest in the invention disclosed and claimed in the '704 application.  Complaint, ¶ 3.  In its present motion and the amended complaint, Plaintiffs allege that Innovatit has assigned its entire right, title, and interest in the '704 application to Avure.  Br. at 1-2.  The Amended Complaint names Avure as a plaintiff.  *See* Dkt. Entry 31.

The specification of the '704 application discloses a process for eliminating harmful bacteria in shellfish, such as oysters, by exposing the shellfish to high pressure for a limited period of time, without applying heat.  R11. The specification also teaches that treating raw shellfish with high pressure assists in "shucking" the shellfish, *i.e.*, opening the shells of the shellfish.  R14.

### 2.    Claims at Issue

Innovatit presented a total of 12 claims for examination:  claims 5 and 27-38.  All of these pending claims are written in the form of a "product-by-process" claim.[2]  Claim 5 recites a raw, "pressure-shucked" shellfish that is free from harmful bacteria:

---

[1] The '725 application is the subject of a related district court action, *Innovatit Seafood Systems, LLC v. Dudas*, Civ. No. 06-822.  Plaintiffs have already received four patents based at least in part on the '725 application:  (1) U.S. Patent No. 6,217,435, which claims a method of shucking raw oysters using high pressure; (2) U.S. Patent No. 6,426,103, which claims a method of destroying harmful bacteria in raw shellfish by exposing the shellfish to high pressure at above ambient temperatures; (3) U.S. Patent No. 6,537,601, which claims a method of destroying harmful bacteria in raw shellfish using high pressure and the application of heat; and (4) U.S. Patent No. 6,393,977, which claims an apparatus for processing raw food using high pressure.

[2] As discussed more fully below, a product-by-process claim is one in which the claimed product is defined at least in part in terms of the process by which it is made.

> A post-pressurized raw shellfish that is pressure-shucked and free from
> pathogenic naturally-occurring marine bacteria and which has undergone
> treatment by exposing said raw shellfish to pressure of about between 20,000
> p.s.i. and 50,000 p.s.i., said raw shellfish retaining sensory characteristics of raw
> product.

R169.  Claims 27-35 and 38 claim various other aspects of a raw, "pressure-shucked" shellfish.

Some of these claims specify the time during which the shellfish are to be pressurized, *i.e.*,

between 1 and 15 minutes, the type of shellfish to be treated (*e.g.*, oysters), the use of "flexible

bands" around the shellfish during treatment, and the specific bacteria to be eliminated from the

shellfish.  R169-70.

The examiner rejected claims 5 and 27-38 as anticipated by an earlier-issued patent, U.S.

Patent No. 5,773,064 issued to John Tesvich *et al.* ("the Tesvich '064 patent" or "Tesvich

'064").  R51-5.  The examiner renewed his rejection of the claims in a final office action dated

July 16, 2002.  R71-2.  Innovatit appealed this final rejection to the Board.  R115.

## B.    The Prior Art of Record:  The Tesvich '064 Patent

The Tesvich '064 patent discloses a method of destroying *Vibrio vulnificus* bacteria on

molluscan shellfish, while leaving the shellfish meat in a raw state.  R56-A - H.  This method

uses "mild heat treatment" followed by rapid cool-down and cold storage.  R56-E, col. 2, lines

31-36; R56-G, col. 5, line 57 - col. 6, line 7.  The mollusks have a band placed around the shells

to keep them closed during treatment; the mollusks are then placed in a circulating bath of warm

water having a temperature of between about 110 °F and 140 °F.  R56-G, col. 5, lines 14-18,

42-47.  The shellfish remain in the warm water bath for between about 10 to 120 minutes,

depending on the size of the mollusks being treated and the temperature of the warm water bath.

*Id.*, col. 5, lines 44-47.  The treatment duration and temperature are selected so as to not cook the

shellfish. *Id.*, col. 5, lines 50-52. Finally, the mollusks are removed from the water bath, quickly cooled in a cold-fluid bath, and refrigerated until consumed, at which point the bands are removed and the shellfish are shucked. *Id.*, col. 5, line 57 - col. 6, line 11. When consumed, the mollusks retain their "natural flavor and raw texture." *Id.*, col. 3, lines 5-9, col. 6, lines 15-18.

### C.    Innovatit's Appeal to the Board

On appeal to the Board, Innovatit argued that all of the pending product-by-process claims were patentable over the Tesvich '064 reference. Acknowledging that the patentability of a product-by-process claim is based on whether the product itself is patentable, Innovatit argued to the Board that "the end product of the claimed invention and the end product of the Tesvich '064 reference are different." R162. Innovatit specifically argued that, unlike the claimed product, the end product of the Tesvich process is (1) not bacteria free; (2) not raw; and (3) not shucked. In support, Innovatit cited the following evidence:

> (i) U.S. Patent No. 5,976,601 to Tesvich *et al.* ("the Tesvich '601 patent" or "Tesvich '601") (R182-88);
>
> (ii) A Letter from Dr. Marilyn B. Kilgen, Professor and Head of the Department of Biological Sciences of Nicholls State University ("Kilgen Letter") (R171-72);
>
> (iii) A letter from Drs. Bell and Bankston, Professors in the Department of Food Science, Louisiana State University ("Bell-Bankston Letter") (R173-74);
>
> (iv) Studies performed by Drs. Jimmy Xu and Sam Godber, Professors in the Department of Food Science at Louisiana State University ("Xu/Godber Studies") (R173-4, R209-10); and
>
> (v) The declarations of Christopher Lee Nelson and Alfred R. Sunseri ("The Nelson and Sunseri Declarations") (R175-81).

R161-67

### D.    The Board Decision

The Board affirmed the examiner's rejection of claims 5 and 27-38 as anticipated by Tesvich '064. The Board considered claim 5 to be representative of the appealed claims, and characterized the product of claim 5 as (1) post-pressurized and pressure-shucked; (2) free from pathogenic naturally occurring marine bacteria; and (3) retaining the sensory characteristics of a raw oyster. R236. The Board found that the Tesvich '064 patent discloses a raw shellfish product that is (1) shucked; (2) free from harmful pathogenic bacteria; and (3) raw, *i.e.*, that retains its natural flavor and raw texture. *Id.* The Board further held that "the Patent Office bears a lesser burden of proof making out a case of *prima facie* unpatentability for product-by-process claims because of their peculiar nature than would be the case when a product is claimed in the more conventional fashion." R235.

The Board found unpersuasive Innovatit's reliance on the Tesvich '601 patent to show that shellfish produced by the process of the Tesvich '064 patent are not bacteria-free and are cooked. The Board pointed out that Tesvich '064 repeatedly teaches that the particular water temperature and treatment duration should be selected to ensure that the shellfish product remain in a raw, uncooked state. R237 (citing R56-F, col. 3, lines 61-65; R56-G, col. 5, lines 50-52). The Board also noted that Tesvich '064 teaches that the described process reduces bacteria on treated oysters to an undetectable level. *Id.* (citing R56-E-F, col. 2, lines 44-46; col. 2, line 66 - col. 3, line 4).

The Board then considered the remaining evidence submitted by Innovatit and found it equally unpersuasive. R239. Specifically, the Board found that the Kilgen Letter and the Bell-Bankston Letter addressed heat and pressure treatments in general and did not specifically

5

address either the claimed invention or the process of the Tesvich '064 patent.  R239-40.  It also

observed that the Bell-Bankston Letter admitted that both the Motivatit process and Ameripure

process result in a shellfish that is "*vibrio* free."  R240.  It likewise found that the Xu/Godber

Studies and the Nelson and Sunseri Declarations failed to explain the process used to produce

the oysters tested.  *Id.*  The Board found that the statements in the Nelson and Sunseri

Declarations about the Tesvich process being "very difficult" to control were counter to the

teachings of the Tesvich '064 patent, since the Tesvich '064 patent taught sorting the oysters by

size prior to treatment.  R241.

Finally, the Board opined that the examiner should consider the patentability of claimed

subject matter in view of Japanese Patent No. 4,356,156 to Miura Yasushi et al. ("JP '156" or

"Yasushi") in the event of further prosecution in the '704 application.  R242-3.  JP '156 teaches

a method of shucking raw shellfish, such as oysters, by exposing them to pressures of between

about 1000 and 4000 "atmospheres" (14,200 p.s.i. to 58,000 p.s.i.) for a period of about 0.5

minutes and 10 minutes.  Exh. A at 1147.  The oysters are thereby rendered easy to open but still

raw.  R1150.

### E.    Plaintiffs' Motion for Summary Judgment

In the instant motion for summary judgment, Plaintiffs change their position with respect

to the appropriate legal standard for determining whether product-by- process claims are

patentable.  As noted earlier, Innovatit acknowledged before the Board that the patentability of a

product-by-process claim is based on whether the product is patentable, irrespective of the

process steps.  R.162.  By contrast, Plaintiffs assert now that "the process limitations of the

product-by-process claim at issue . . . should be considered by the decision-maker" in

determining patentability of the claims.  Br. at 13.  Otherwise, Plaintiffs make the same

arguments, and rely on the same evidence, as Innovatit did before the Board.

## ARGUMENT

**I.    THE BOARD DID NOT ERR IN DETERMINING THE PATENTABILITY OF PLAINTIFFS' PRODUCT-BY-PROCESS CLAIMS BASED ON THE PRODUCT ITSELF AND NOT ON THE PROCESS BY WHICH IT IS PRODUCED**

Plaintiffs acknowledged below that the "determination of patentability [of a product by

process claim] is based on the product itself."  R162.  The Board agreed with that position.

R235. Plaintiffs now assert that this issue is "unsettled."  Br. at 7.  In this regard, Plaintiffs assert

that in *Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565 (Fed. Cir.

1991), one panel of the Federal Circuit "indicated that a product-by-process claim is infringed

even if the [accused] product is made by a different process."  Br. at 7-8.  Conversely, Plaintiffs

argue that in *Atlantic Thermoplastics Co., Inc. v. Faytex Corp.*, 970 F.2d 834 (Fed. Cir. 1992), a

different panel of the Federal Circuit "indicated that process terms in a product by process claim

may limit such a claim."  Br. at 8.  Plaintiffs, however, miss one critical point about the *Scripps*

and *Atlantic Thermoplastic* opinions, a point that renders both cases factually distinguishable

from this case.  The context in which those cases arose – the determination of whether a product

by process claim is infringed – is different than that of the present case – the determination of

whether a product by process claim is patentable in the first place.  Indeed, both *Scripps* and

*Atlantic Thermoplastics* agree that in determining the *patentability* of a product by process claim,

the product and *not* the process by which that product is made controls.  *See Scripps*, 927 F.2d at

7

1583 ("In determining patentability [of product by process claims] we construe the product as not limited by the process stated in the claims."); *Atlantic Thermoplastics*, 970 F.2d at 845 ("even though product by process claims are limited by and defined by the process, determination of patentability is based on the product itself" (citation omitted)). Thus, the issue is quite settled: The *patentability* of Plaintiffs' product by process claims is to be determined by the product and not by the process stated in the claims.

A more recent Federal Circuit opinion, *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312 (Fed. Cir. 2006), confirms this principle.  In that case, the issue was whether SmithKline's claims to its drug paroxetine made by an allegedly novel process were anticipated by SmithKline's earlier disclosure of paroxetine itself.  *Id.* at 1313-14.  The court held that it was so anticipated.  The court noted that product by process claims "are always to a product not a process."  *Id.* at 1317.  This is important because "once a product is fully disclosed in the art, future claims to that same product are precluded, even if that product is claimed as made by a new process."  *Id.* at 1316.

In their current motion, Plaintiffs urge this Court to ignore the majority opinion in *SmithKline Beecham*, follow the *dissent* in that case, and apply *Atlantic Thermoplastics* for the proposition that "the process limitations of the product-by-process claims at issue be considered in determining whether the claims are patentable."  Br. at 13.  The Court should reject this invitation.  First, Plaintiffs do not cite any legal basis for ignoring binding precedent in favor of a nonbinding dissent.  Nor is there any.  Further, as discussed above, *Atlantic Thermoplastics* is not applicable to the present case, and even acknowledges that a different rule should apply in the context of determining the *patentability* of such claims.  *Atlantic Thermoplastics*, 970 F.2d at

8

845. Accordingly, the Board did not err in determining the patentability of Plaintiffs' product-by-process claims based on the product itself and not on the process by which it is made.

## II.    PLAINTIFFS' MOTION MUST FAIL BECAUSE THE BOARD'S DECISION FINDING THE CLAIMS OF THE '704 APPLICATION TO BE ANTICIPATED BY TESVICH '064 IS SUPPORTED BY SUBSTANTIAL EVIDENCE

"A person shall be entitled to a patent unless—the invention described in . . . a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent."  35 U.S.C. § 102(e).  A determination that a claim is anticipated under 35 U.S.C. § 102 requires a finding that each and every limitation is found either expressly or inherently in a single prior art reference.  *Transclean Corp. v. Bridgewood Serv., Inc.*, 290 F.3d 1364, 1370 (Fed. Cir. 2002).  Anticipation is a question of fact; the Board's finding of anticipation must therefore be upheld if supported by substantial evidence.  *In re Gartside,* 203 F.3d 1305, 1316 (Fed. Cir. 2000).  Plaintiffs' motion for summary judgment must fail because the Board applied the correct legal standard in determining the patentability of Plaintiffs' product-by-process claims (as discussed above) and because its finding that the pending claims are anticipated by Tesvich '064 is supported by substantial evidence.

### A.    The Pending Claims Cover a Raw, Shucked Mollusk That is Free from Pathogenic Bacteria

Representative claim 5 recites:

A post-pressurized raw shellfish that is pressure-shucked and free from pathogenic naturally-occurring marine bacteria and which has undergone treatment by exposing said raw shellfish to pressure of about between 20,000 p.s.i. and 50,000 p.s.i., said raw shellfish retaining sensory characteristics of raw product.

9

R169.[3]  The "product" that Plaintiffs claim here is a (i) shellfish (*i.e.*, mollusk, such as oyster or clam); that is (ii) raw ("retaining sensory characteristics of raw product"); (iii) free from harmful marine bacteria such as *Vibrio vulnificus*; and (iv) shucked (*i.e.*, the shell is open).

Plaintiffs complain that the USPTO erroneously ignored the "post-pressurized," "subjected to high pressure," and "pressure-shucked" language of claim 5.  Br. at 14.  Plaintiffs misapprehend the import of this language in claim 5.  That language does not impart patentability to the claim.  The term "post-pressurized" as used in representative claim 5, and the related process limitations in that claim (directed to the exposure of the shellfish to a specific high pressure range for a specific period of time), do not describe a physical or structural characteristic of the claimed shellfish. Indeed, the purpose and object of the disclosed pressurization process is to avoid changing the physical characteristics of the raw shellfish.  R11 ("It is another object of the present invention to provide a method of reducing harmful bacteria in raw shellfish without substantially affecting its sensory qualities").  Thus, one of ordinary skill in the art would not be able to tell the difference between a raw oyster that has been pressurized according to the disclosed process, and one that has not (other than in terms of the absence of pathogenic bacteria, a characteristic that is recited as a separate limitation).  Therefore, the "post-pressurized" and "subjected to high pressure" terms do not confer patentability on the claimed product.

Similarly, the term "pressure-shucked" as used in representative claim 5 does not impart physical characteristics to the claimed product.  Rather, it refers to the method by which the shell

---

[3]  In their motion for summary judgment, Plaintiffs do not argue each of their pending claims separately.  Thus, all of their claims stand or fall together.  *See In re Dance*, 160 F.3d 1339, 1340 n.2 (Fed. Cir. 1998).  The Board found claim 5 to be representative, R233, a finding that Plaintiffs did not challenge in their motion for summary judgment.

of the mollusk is opened to expose the meat of the shellfish.  But whether shucking is performed

by pressure or mechanically, the end result is the same:  a shucked oyster.  Thus, like the terms

"post-pressurized" and "subject to high pressure," the term "pressure-shucked" as used in claim

5 does not accord patentability to the claimed product.

### B.    Tesvich Discloses a Raw, Shucked Mollusk That Is Free from Pathogenic Bacteria

The Board found "that the product of Tesvich '064 reasonably appears to be identical to

the product recited in claim 5 on appeal."  R236.  The Board specifically found that Tesvich '064

discloses a shellfish that is (i) raw, *i.e.*, that retains the sensory characteristics of raw product;

(ii) free from pathogenic naturally-occurring marine bacteria; and (iii) shucked.  Substantial

evidence supports these findings.

Tesvich '064 discloses a process for treating unshucked raw molluscan shellfish to

destroy harmful bacteria on the shellfish while leaving the shellfish meat in a raw state.  R56-E,

col. 2, lines 32-36, 66-67.  The shellfish are separated into grades according to size, and banded

to prevent the shell from opening during processing.  R56-G, col. 5, lines 10-18.  The shellfish

then undergo "mild heat treatment," preferably by immersion in a circulating bath of water

heated to about 110-140 ° F (43.3-60 ° C).  R56-G, col. 5, lines 37-44.  The mild heat treatment

may last between 10 and 120 minutes, depending on the grade size of the shellfish and the

temperature of the warm fluid bath.  *Id.*, col. 5, lines 44-47.  Tesvich '064 cautions that "[t]he

temperature of the fluid bath and immersion time period is selected as to not cook the mollusk."

*Id.*, col. 5, lines 50-52.  Next, the shellfish are cooled, preferably in a continuously flowing cold

fluid bath that is between about 28-36° F, for about 15-20 minutes, depending on the grade of

the product.  *Id.*, col. 5, lines; col. 6, lines 3-6.  The shellfish are then refrigerated until

11

consumed, at which point the bands are removed and the shellfish are shucked.  R56-F, col. 3, lines 5-7; R56-G, col. 6, lines 8-12; R56-H, col. 8, lines 14-18.

Thus, the product of the process disclosed in Tesvich '064 is the same as the product recited in claim 5 on appeal.  Tesvich '064 discloses a shellfish that is raw, because Tesvich '064 teaches grading the shellfish and selecting the mild-heat-treatment temperature and duration that is appropriate for each grade to avoid cooking the shellfish.  Tesvich '064 also expressly discloses a shellfish that is free from harmful marine bacteria, such as *Vibrio*.  R56-F, col. 3, lines 45-50; R56G, col. 6, lines 32-35.  Finally, Tesvich '064 expressly discloses that the shellfish are shucked.  *See* R56F, col. 3, lines 5-7 ("To serve the mollusk one removes the band and removes the shell per the known 'raw bar' style mollusk preparation method"); R56H, col. 8, lines 16-18 (claiming "shucking" of the raw shellfish after processing and before consumption).  Accordingly, substantial evidence supports the Board's finding that representative claim 5 is anticipated by Tesvich '064 and not patentable under 35 U.S.C. § 102(e).

## III.    THE EVIDENCE MARSHALED BY PLAINTIFFS IN THEIR MOTION IS INSUFFICIENT TO JUSTIFY REVERSING THE BOARD'S DECISION

Relying on the same evidence as that presented to the Board, Plaintiffs argue that "[e]ven assuming, *arguendo*, that the PTO's initial rejection of the asserted claims was proper, Plaintiff nevertheless met its burden (within the meaning of MPEP § 2113) and clearly demonstrated that its product is different from any product that could be produced by the [Tesvich] '064 patent.  Moreover, such differences are clearly recognized by persons of ordinary skill in the art."  Br. at 14-15.  Plaintiffs are wrong.  An examination of the evidence upon which Plaintiffs rely demonstrates that the Board was fully justified in finding such evidence to be unpersuasive of the patentability of the pending claims.

12

A.     **The Kilgen Letter Is Irrelevant Because it Does Not Compare the Tesvich '064 Product with the Claimed Product**

Plaintiffs argue that the Kilgen letter "fully supports the Plaintiffs' position that heat treatment caused irreversible changes in the structure of the protein food product, such as the oyster and that a shellfish product that has been treated by heat to eliminate bacteria inevitably has different sensory characteristics than a product treated by high pressure."  Br. at 16. Plaintiffs misinterpret the contents of the Kilgen letter.  As the Board correctly noted, the Kilgen letter refers to "thermal or heat processing," and "high pressure processing" in general, and does not specifically compare the product resulting from the Tesvich '064 process with the claimed product.  *See* R171.  This is particularly significant because the findings of the Kilgen Letter depend on "the level of heat," suggesting, as taught by Tesvich '064, that as long as the heat is kept below a certain level, the shellfish is not cooked.  Thus, the Kilgen Letter does not constitute probative evidence that the Tesvich '064 product differs from the product resulting from the claimed process.  *See In re de Blauwe*, 736 F.2d 699, 705 (Fed. Cir. 1984) (when using comparative test data to show that its product differs from that of the prior art, an applicant must compare his claimed invention to the "closest prior art"); *In re Woodruff*, 919 F.2d 1575, 1578 (Fed. Cir. 1990) (applicant's comparison of his invention with a commercial embodiment of the prior art invention was not probative, because it was not a comparison with the actual method taught in the prior art patent).

**B.** **The Bell-Bankston Letter Is Irrelevant Because it Shows No Difference Between the Tesvich '064 Product and the Claimed Product**

Plaintiffs also argue that the Bell-Bankston Letter demonstrates a physical difference between the claimed oyster and the Tesvich '064 oyster. Br. at 17. The USPTO disagrees. The Bell-Bankston Letter fails to show a difference between the claimed product and the Tesvich '064 product. As the Board noted, it only refers generically to oysters produced by the "Motivatit" and "Ameripure" processes, but does not specifically identify those processes as corresponding to the claimed process or the Tesvich '064 process. Plaintiffs argue that it is "well-known in the industry that John Tesvich is the President and co-owner of several Louisiana companies named 'Ameripure.'" Br. at 16. But even if this were true, there is nothing in the Bell-Bankston Letter to indicate that the "Ameripure" process discussed therein is that which is specifically disclosed in the Tesvich '064 patent. This is not a mere technicality, considering that Plaintiffs' other declarants, Mr. Nelson and Mr. Sunseri, misunderstood a key aspect of the Tesvich '064 process: that the oysters are separated into different grades based on size prior to heat treatment, as an additional precaution against overcooking. Therefore, it cannot be assumed, in the absence of a specific description of the products and processes being compared, that the comparison is correct. Moreover, assuming *arguendo* that the Bell-Bankston letter discusses the processes at issue here, it actually lends support to the notion that the products resulting therefrom are substantially the same. Specifically, the Bell-Bankston letter admits that the final product oyster from Motivatit and Ameripure are both "*vibrio* free" and only differ in physical condition "depending on the application of the shucking knife." R240.

14

C.    **The Xu/Godber Studies Suffer from the Same Defect as the Bell-Bankston Letter: They Do Not Establish That the Claimed Oyster Was Compared Against the Tesvich '064 Oyster**

Plaintiffs also refer to the Xu studies, and to a study by Dr. Sam Godber, as showing structural differences between oysters treated according to the instant claims and the Tesvich '064 process.  Br. at 17 (these studies are discussed in a September 12, 2003 letter from Dr. Bell, which appears in the record at R209-10).  The Board justifiably gave this evidence little weight.  First, this evidence suffers from the same infirmity as that discussed in connection with the Bell-Bankston Letter: the precise testing protocol is not spelled out, but rather Dr. Bell refers to a comparison of "HPP-treated oysters from Motivatit and cold-temperature pasteurization oysters from Ameripure."  R209.  Dr. Bell does not clearly indicate that oysters treated according to the claims were being compared to oysters treated according to the teachings of the Tesvich '064 patent.  Moreover, there is insufficient information provided as to what controls were in place to ensure that the slight differences noted were not attributable to something other than how the oysters were treated (*e.g.*, individual variation, small sample size, where the oysters were harvested, etc.)

Second, even if it can be assumed that the correct processes were being compared, the evidence is unavailing.  The Xu studies identify slight differences in the fatty acid profile between the oysters treated by "Motivatit HPP," oysters treated by "Ameripure Cold Pasteurization," and raw untreated oysters.  But such differences are not relevant.  The claims at issue do not recite that the treated oysters have the same fatty acid profile as that of raw oysters, only that they have the same "sensory characteristics" – presumably taste, consistency, mouth feel – as raw oysters.

15

Dr. Godber's study purported to compare the sensory characteristics of the claimed oysters with those of the Tesvich '064 process.  A close reading of Dr. Bell's description of this study indicates, however, that the "results are not rigorous for publication, as the study was selected as a method to demonstrate techniques used in food science analysis."  R209.  In other words, the purpose of the study was not to generate reliable information as to the physical differences between a pressure-treated oyster and a heat-treated oyster, but as a means of teaching Dr. Godber's students "sensory analysis techniques."  *Id.*  For all these reasons, the Board correctly gave the Xu/Godber Studies little weight.

### D.    The Nelson/Sunseri Declarations, Like Plaintiffs' Other Evidence, Does Not Make the Right Comparison Between the Claimed Oyster and the Tesvich '064 Oyster

Plaintiffs further rely on the Nelson/Sunseri Declarations to establish differences between the mildly-heat-treated oyster of the Tesvich '064 process and the post-pressurized oysters of the claimed process.  Br. at 18-19.  The Nelson-Sunseri declarations are equally unconvincing.[4]  Again, the declarations do not set forth the specific processes used to produce the oysters tested, and thus it is suspect whether the results reflect a true comparison of the claimed oyster with the Tesvich '064 oyster.  *See de Blauwe*, 736 F.2d at 705 *supra*; *Woodruff*, 919 F.2d at 1578.  While the declarations state that the oyster meat's outer membrane is "usually" cut during mechanical shucking, they do not specify if this was the case with the product actually tested.  The declarations also state that the Tesvich '064 process is "very difficult" to control and results in "over cooking" the less dense oysters.  R176.  In this regard, the declarations seem to assume

---

[4]  The fact that these two declarations are virtually identical strongly suggests that they were written by Plaintiff counsel rather than by the declarants themselves.  For this reason alone, they should be given little weight.

16

that the Tesvich '064 process involves batches of oysters containing oysters of varying sizes and densities. *Id.* This assumption is incorrect, since Tesvich '064 expressly discloses separating the oysters by size prior to treatment. R56-G, col. 5, lines 11-13. Tesvich '064 thus teaches, contrary to the understanding of Mr. Nelson and Mr. Sunseri, that the process is controlled by temperature, duration, *and oyster size* to destroy harmful bacteria while keeping the meat raw.

      E.      **The Tesvich '601 Patent Does Not Undermine Tesvich '064**

Plaintiffs argue, as Innovatit did below, that Tesvich '064 does not disclose a raw, bacteria-free product, since the same inventors, Tesvich *et al.*, acknowledged in a subsequent patent (Tesvich '601) that oyster meat will start to cook if it reaches 53 ° C (127.4 ° F), and that the water bath must be between 49 ° C (120.2 ° F) and 55 ° C (131 ° F) to kill *V. vulnificus* bacteria. Br. at 19-20. This argument is unpersuasive. As the Board noted, Tesvich '064 repeatedly teaches that the temperature and duration parameters of the process are to be chosen so that the pathogenic bacteria on the shellfish are reduced to an undetectable level, *and* so that the shellfish remain raw following treatment. *See, e.g.*, R56-F, col. 3, lines 61-65; R56-G, col. 5, lines 52-62. A person of ordinary skill in the art would require only routine experimentation to optimize the parameters to achieve this result. *See In re Kulling*, 897 F.2d 1147, 1149 (Fed. Cir. 1990) (affirming Board decision that claimed amount of "eluent" to be used in washing sequence was a "matter of routine optimization in the pertinent art"); *In re Peterson*, 315 F.3d 1325, 1330 (Fed. Cir. 2003) ("discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art"). Hence, Plaintiffs' reliance on Tesvich '601 to undermine Tesvich '064 is unavailing.

17

**IV.    PLAINTIFFS' CLAIMS ARE ALSO ANTICIPATED BY JP '156**

If the Court decides to grant Plaintiffs' cross-motion or deny Defendant's motion for

summary judgment, the USPTO submits that the Court should remand this case to the USPTO

for it to consider whether JP '156 anticipates the pending claims.  Remand had been repeatedly

used in prior Section 145 actions to permit the USPTO to examine claims in light of prior art not

previously considered so that a Court may "benefit from the Patent Office's technical expertise

in assessing the art."  *ExxonMobil Chem Patents Inc. v. Godici*, 2002 WL 34233002, at *3

(D.D.C. Feb. 12, 2002) (citing other D.D.C. cases that were remanded to the USPTO for further

examination after discovery of additional prior art).  Furthermore, the Board itself observed the

appropriateness of examining the '704 application in light of JP '156.  R242-3.  Remand to

consider the pending claims in light of JP '156 would conserve judicial resources that would

otherwise be expended trying factual issues that would be moot in light of JP '156.

There can be no serious dispute that an oyster produced by the method disclosed in

JP '156 is identical to the claimed oyster.  First, although the "post-pressureized" and "pressure-

shucked" terms do not confer patentability on the claims, *see infra* Part II-A, and a court need

not consider these terms in deciding whether JP '156 anticipates, the reference nevertheless

discloses a process that uses pressure to shuck oysters.  It is thus clear that JP '156 produces an

oyster that is "post-pressurized," and "pressure-shucked."  *See* Exh. A to Defendant's

Memorandum in Support of its Motion for Summary Judgment (Nov. 2, 2007) at 3.  JP '156 also

discloses an oyster that has been exposed to pressure of about 20,000 psi to 50,000 psi.  JP '156

discloses, *inter alia*,  pressurizing oysters at 3000 atmospheres (44,100 psi) for three minutes.

*Id.* at 5.  This is squarely within the time and pressure ranges set forth in claims 27-35 and 38.

18

While JP '156 does not expressly disclose that its process produces an oyster that is free from harmful bacteria, this is an inherent result of the disclosed process.  *See Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1347 (Fed. Cir. 1999) ("Under the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claimed limitations, it anticipates." (internal citation omitted)).  That the disclosed process of JP '156 would produce a *Vibrio* free oyster is evident from the fact that the process is conducted within the time and pressure parameters of Plaintiffs' claims, which Plaintiffs must admit is sufficient to disinfect oysters.  Thus, JP'156 anticipates the pending claims of the '704 application.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant respectfully requests this Court enter an order granting its motion for summary judgment and denying Plaintiffs' cross-motion for summary judgment.

Dated: November 30, 2007              Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


_____/s/ Robin M. Meriweather_____
ROBIN M. MERIWEATHER, D.C. Bar # 490114
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
(202) 514-7198    Facsimile: (202) 514-8780


Of Counsel:
STEPHEN WALSH
Acting Solicitor

BENJAMIN D. M. WOOD
JANET GONGOLA
Associate Solicitors
United States Patent and Trademark Office

November 30, 2007